Keith WALDMANN, et al, Plaintiffs,

v.

**Dr. Ray R. FULP, III,
et al, Defendants.**

**CIVIL ACTION NO. 7:13–CV–495**

United States District Court,
S.D. Texas, McAllen Division.

Signed 10/12/2016

Entered October 13, 2016

**584**

Mitchell Craig Chaney, Victor Rodriguez, Jr, Nicondra Seane Chargois–Allen, Colvin, Chaney, Saenz & Rodriguez, LLP, Brownsville, TX, Johnny W. Carter, Richard Wolf Hess, Susman Godfrey LLP, Houston, TX, Omar A. Ochoa, Susman Godfrey LLP, Dallas, TX, for Plaintiffs.

Jordan Matthew Parker, Jeff Frank Kinsel, Jr., Timothy Derek Carson, Cantey Hanger LLP, Fort Worth, TX, Daniel Gordon Gurwitz, Atlas Hall Rodriguez LLP, David George Oliveira, Roerig Oliveira and Fisher, Raymond L. Thomas, Jr, Kittleman Thomas et al, Gerald Edward Castillo, Attorney at Law, McAllen, TX, Brian G. Flood, Afton Dee Sands, Lorinda Holloway, Afton Dee Sands, Husch Blackwell LLP, Austin, TX, Alexander Edelson, Gary A. Orseck, Michael L. Waldman, Robbins Russell Englert Orseck Untereiner & Sauber LLP, Washington, DC, for Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Randy Crane, United States District Judge

Now before the Court are Defendants McAllen Medical Center's ("MMC"), South Texas Health System's, and McAllen Hospitals, L.P.'s (collectively, the "MMC Defendants") Motion to Dismiss, or, in the Alternative, for Summary Judgment, (Dkt.

No. 172); Defendants RedMed, Inc.'s ("RedMed"), Jeffrey L. Hannes's, and Northern Services LLC d/b/a Advanced Orthopedic Solutions' ("AOS") (collectively, the "RedMed Defendants") Motion for Summary Judgment, (Dkt. No. 173); Defendant Dr. Ray Fulp, III's Motion for Summary Judgment, (Dkt. No. 175); and Defendant Alex Santos's Motion for Summary Judgment, (Dkt. No. 176). Having considered the Motions for Summary Judgment of the various Defendants and the MMC Defendants' Motion to Dismiss, as well as the responsive briefing, (Dkt. Nos. 182, 183, 186, 187, 190, 191, 192, 193, 194), the Court finds that the Motions should be denied for the following reasons.

### I. Factual and Procedural Background

Plaintiffs and *qui tam* Relators Keith Waldmann and Adan Ponce (collectively, "Relators") brought suit against Defendants Dr. Ray Fulp, III, Alex Santos, MMC,[1] RedMed, and Jeff Hannes on September 9, 2013. (Dkt. No. 1). Relators subsequently amended their complaint to add Defendant Northern Services, LLC d/b/a Advanced Orthopedic Solutions "AOS." (Dkt. No. 165). Defendant Fulp is a Doctor of Osteopathy who practices at MMC and other hospitals in the Rio Grande Valley, and Defendant Santos is a Surgical Technologist First Assistant ("scrub technician" or "surgical assistant") who also works at MMC. *Id.*, ¶¶ 27, 28. Defendants RedMed, Inc. and AOS are Texas corporations that specialize in providing medical devices to doctors in the Rio Grande Valley, and Defendant Hannes is the sole owner of both

---

1. Relators originally brought suit against McAllen Medical Center, later adding Defendants South Texas Health System and McAllen Hospitals L.P. in their First Amended Complaint. (Dkt. No. 12). South Texas Health System is a network of hospitals in the Rio Grande Valley, including McAllen Medical Center. It is owned and operated by McAllen Hospitals, L.P., a subsidiary of Universal Health Services that operates under the business names "McAllen Medical Center" and "South Texas Health Systems." *Id.*, at ¶¶ 30–32. For convenience, the Court will refer to these three Defendants collectively as "MMC."

RedMed and AOS. *Id.*, ¶¶ 30, 32; (Dkt. No. 173–2, ¶¶ 2, 3).

Relators' Second Amended Complaint, their live pleading, generally alleges that Defendants have submitted or caused to be submitted hundreds of false claims to federal and state agencies in conjunction with requests for payment by Medicare, Medicaid, and TriCare for surgical and other medical procedures performed at MMC. Specifically, Relators allege that since at least 2009 Defendants have engaged in a pattern and practice of submitting claims that falsely certify that Dr. Fulp performed medical procedures on patients, while in reality they were performed in whole or in part by Mr. Santos and/or one another individual, Eberardo Martinez, neither of whom are licensed to practice medicine in any state. (Dkt. No. 1, ¶¶ 1, 4). In addition, Relators allege that Santos was receiving illegal kickback payments from RedMed, AOS, and Hannes in exchange for Fulp's and Santos's use of RedMed devices in violation of the Federal Fraud and Abuse Anti–Kickback Statute, 42 U.S.C. §§ 1320a–7b, ("AKS") and the Prohibited Referral Provisions, 42 U.S.C. § 1394nn, ("the Stark Law"). *Id.*, at ¶ 2. In addition to the false claims that Fulp performed surgeries when in fact Santos or Martinez did, Relators allege that these AKS and Stark Law violations also resulted in fraudulent claims. *Id.* Relators allege that, through this scheme, the Defendants have caused hundreds of false certifications and claims to be made to federal and state agencies, resulting in millions of dollars in damages. *Id.*, ¶ 4. They bring claims for violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), FCA Conspiracy under 31 U.S.C. § 3729(a)(1)(C), and the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Human Res. Code Ann. §§ 36.002(1), (4)(B). *Id.*, ¶¶ 92–109.

After Relators filed their First Amended Complaint, Defendants filed motions to dismiss for failure to state a claim, (Dkt. Nos. 24, 25, 26, 31), which the Court denied without prejudice to refiling as motions for summary judgment in order to allow for a brief period of discovery, (Dkt. No. 44). Defendants subsequently moved for summary judgment. (Dkt. Nos. 55, 56, 59). After concluding that Relators had not had the opportunity to conduct adequate discovery regarding specific aspects of their claims, the Court denied the motions without prejudice to allow for an additional ninety day period of discovery. (Dkt. No. 140). After the additional discovery period ended, and with leave of the Court, Relators filed their Second Amended Complaint, to which the present Motions for Summary Judgment and Motion to Dismiss are now directed. *See* (Dkt. Nos. 164, 165).

## II. Relators' Second Amended Complaint

The Court considers that the case can be divided generally into two theories which, if supported, may give rise to liability for one or more of the Defendants under the FCA and TMFPA: hereinafter the "Surgery Delegation Scheme" and the "Device Scheme." In discussing the Relators' Second Amended Complaint and the pending motions, the Court will address each of these theories of liability separately.

### A. The Surgery Delegation Scheme

The Relators' Second Amended Complaint alleges that Relators, who worked as medical device sales representatives in the Rio Grande Valley, personally witnessed Santos and Martinez—who are both scrub techs not licensed to practice medicine—perform "numerous procedures, without Fulp's supervision, including epidural ster-

oid injections, pulling infected pins from patients who had previously undergone surgery, a cervical fusion, inserting scoliosis pins, a total knee replacement, and a total hip replacement," and that such incidences occurred "almost every time they were in the operating room with Fulp." (Dkt. No. 165, ¶¶ 39, 41, 43). They allege that, "[o]n numerous occasions, Waldmann and Ponce independently witnessed Fulp attend the start of a surgery and perform initial incisions, only to leave the room entirely and turn the remainder of the surgery over to Santos." *Id.* at ¶ 42. Without direction or supervision from Fulp, Santos would cut through tissue and bone, install artificial joints, and close the incision site." *Id.* While Relators acknowledge that they did not attend every one of Fulp's procedures, they claim that nearly every one they witnessed involved Santos performing "key and critical portions" of the surgeries. *Id.* at ¶ 66. This delegation of surgical duties to Santos, Relators allege, was part of a scheme which "allowed Fulp to leave the operating room to perform, or begin, other surgeries and procedures at MMC," thereby allowing Fulp and MMC to bill for and collect more funds from government health-insurance programs. *Id.* at ¶¶ 1, 42. They allege that MMC knew about the scheme and received complaints from hospital employees, but did nothing to stop it, and that MMC continued to submit its own claims, each time falsely certifying that Fulp had performed the procedures. *Id.* at ¶ 1.

To illustrate what they assert is a pattern and practice, Relators list illustrative examples of the Surgery Delegation Scheme. They point specifically to four separate occasions between August 2010 and March 2012 in which either Santos or Martinez performed all or substantially all of the surgeries on patients without Fulp's supervision or presence in the operating room. *Id.* ¶¶ 46–53. Relators allege that each of these surgeries were billed to gov-

ernment payors as if Fulp or someone under his direct supervision had performed them. *Id.* On two such incidences, they allege MMC was made aware that the scrub technician had acted outside of the scope of what the scrub technician is permitted to do under state and federal laws. *Id.* In response to complaints, MMC conducted a "cursory" investigation wherein MMC administrators determined that it was "clear" that Fulp should have been directly supervising the scrub technician, but that MMC took no action other than "counseling" of Santos, who continued to conduct surgeries unsupervised in violation of state and federal laws. *Id.,* ¶ 53.

Relators' complaint also incorporates by reference a video taken on a cell phone camera in an MMC operating room, which Relators allege depicts Santos performing a total knee arthroplasty while Fulp was not present in the operating room. *Id.,* ¶¶ 56–64. They also allege that a nurse at MMC made reports to MMC administrators that she witnessed Santos complete surgical procedures without Fulp being present and that, on September 30, 2010, several nurses sent a signed petition to MMC administrators expressing "concern for our patients" because scrub technicians were performing surgical tasks. *Id.,* ¶¶ 50, 55. They allege that, upon hearing of these complaints, Fulp became angry and attempted to intimidate hospital staff by posting signs in MMC's OR suite calling those who reported the incidents to MMC "rats" and "bottomdwellers." *Id.,* ¶ 54. As other indicia of the willful scheme, Relators allege that, in May or June of 2013, Santos served a three-day suspension for violating a HIPAA regulation, during which time Fulp cancelled all of his scheduled procedure. *Id.* at 65. On certain occasions, Relators allege, Fulp's second, third, and fourth patients would be in the recovery room while Fulp's first patient was still in surgery. *Id.* They also allege that San-

tos, instead of Fulp, would sometimes meet patients' families to discuss results of operations. *Id.* Relators assert that the Surgical Delegation Scheme resulted in fraudulent claims being submitted to and paid by government healthcare payors.

## B. The Device Scheme

With respect to the alleged AKS and Stark Law violations, Relators allege that RedMed, AOS, and Hannes paid commissions to Santos for devices that Fulp used in surgeries with the purpose of inducing Santos and Fulp to order and use Red-Med's medical equipment. *Id.,* ¶ 79. Santos, who Relators allege held himself out to be a sales representative to doctors, MMC staff, and other device representatives, allegedly received commissions from RedMed and later AOS for surgical devices he used while also working as Fulp's scrub technician. *Id.* at ¶¶ 83, 84. This relationship, according to Relators, created powerful incentives for Fulp and Santos to overuse and misuse medical devices and products by RedMed. *Id.,* ¶ 80. As an example of such overuse, they allege that, while a typical bone surgery may require a plate and six screws—totaling to a $1,800 bill from the manufacturer—Fulp and Santos would use the same hardware, plus a 5cc amount of frozen bone growth material, of which they only use 1cc and discard the rest, resulting in an additional $4,000 in sales to the manufacturer. *Id.* at ¶¶ 80, 87.

Relators further allege that both Fulp and MMC were aware of the relationship between Santos and RedMed and were either complicit in or helped establish it. *Id.,* ¶¶ 81, 82. They allege that, after having received numerous complaints about the propriety of the arrangement, MMC's compliance department urged administrators to end the relationship, but that MMC executive officer Joe Riley instructed the compliance department to "back off" of Santos because he was a "key player" in

the hospital's business. *Id.* at ¶ 82. Stryker, a device manufacturer that supplied products to RedMed, was allegedly alerted of the kickback scheme and asked RedMed to sever ties with Santos. *Id.* at ¶ 85. Relators allege that MMC OR Supervisor Mario Garza wrote Stryker, purporting that MMC had conducted an "extensive investigation" and found the relationship between Santos and RedMed to be legal. *Id.* In reality, Relators allege, MMC only performed a cursory review of the relationship and did not take any action to change it. *Id.* In May 2012, Relators allege that Hannes assured Stryker that RedMed had no further financial arrangement with Santos but that, in reality, Hannes had simply begun to remunerate Santos through AOS instead of RedMed. *Id.* at ¶ 86. Relators allege that RedMed's payments to Santos were for the benefit of Fulp and a "bribe" or "kickback" to Fulp so that Fulp received the benefit of Santos's services without having to compensate him for the value of those services in exchange for using medical devices sold by Red-Med/AOS. *Id.* at ¶ 86. Relators allege that the Device Scheme resulted in fraudulent claims being submitted to and paid by government healthcare payors.

## III. Defendants' Motions to Dismiss and for Summary Judgment

The MMC Defendants argue in their Motion to Dismiss, or, in the Alternative, for Summary Judgment that Relator's claim for FCA and TMFPA liability from the Surgery Delegation Scheme should be dismissed because such delegation, even if improper, does not give rise to FCA liability. (Dkt. No. 172). The MMC Defendants, Fulp, and Santos also move for summary judgment on the FCA and TMFPA claims on this ground. (Dkt. Nos. 172, 175, 176). In addition, they argue for summary judgment because they assert that Relators have failed to identify specific false claims

that were submitted to a government payor. *Id.*

With respect to the Device Scheme, the RedMed Defendants seek summary judgment on the FCA and TMFPA claims under the theory of an AKS violation on the grounds that Santos was a bona fide employee of either RedMed or AOS, and thus payments to Santos fall under the AKS safe harbor provision. (Dkt. No. 173). The RedMed Defendants, Fulp, and Santos move for summary judgment on the FCA and TMFPA claims under the theory of a Stark Law violation on the grounds that Relators have provided no evidence of a financial relationship between the RedMed Defendants and Fulp. (Dkt. Nos. 173, 175, 176). Finally, MMC also moves to dismiss Relators' FCA and TMFPA claims on the grounds that their Stark Law and AKS allegations fail to satisfy the proper pleading requirements of Rules 9(b) and 12(b)(6). (Dkt. No. 172).

■ The Court notes that, although Defendants have filed their motions separately, there is significant overlap among the arguments presented therein. Accordingly, the Court will address the Motions as a whole. Furthermore, the Court notes that, while the MMC Defendants' Motion was filed under Rule 12(b)(6), it presents significant matters outside the scope of the pleadings. *See* (Dkt. No. 172–1) (incorporating ten exhibits, including MMC internal documents, patient records, e-mails, and deposition transcripts). The Court has discretion to convert a motion to dismiss into a motion for summary judgment and thereby consider the matters submitted by the parties that are beyond the scope of the pleadings. *See, e.g., Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 193–96 (5th Cir. 1988). A court may convert a Rule 12(b)(6) motion into a motion for summary judgment without advising either party of its intention to do so, but must allow the non-

moving party at least ten days in which to submit its own evidence. *Id.* at 195–96; *Holguin v. U.S. Dept. of Army*, 98 F.3d 1337 (5th Cir. 1996). Relators responded to each of the pending Motions, including the Motion to Dismiss, in one omnibus response and provided their own summary judgment evidence. *See* (Dkt. No. 182). The Court considers the materials proffered by the MMC Defendants in their Motion to Dismiss to be useful and that a consideration of those materials here would facilitate a prompt disposition of the action. *See Isquith*, 847 F.2d at 193, note 3. Furthermore, in light of the period of discovery already provided, the Parties' lengthy briefing on the Summary Judgment Motions, and the fact that the MMC Defendants requested Summary Judgment as an alternative to dismissal in their Motion, the Court considers that neither party will be prejudiced by the Court's conversion of the 12(b)(6) Motion into a Motion for Summary Judgment. Accordingly, the Court will consider the materials and assess the MMC Defendants' Motion as a Motion for Summary Judgment under the standard set forth in Rule 56.

### A. Summary Judgment Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the

record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(a), (c). Where the movant bears the burden of proof because it is asserting an affirmative defense, it must establish " 'beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor.' " *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)) (emphasis in original). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## B. False Claims Act Liability

■ The False Claims Act (FCA) prohibits false and fraudulent claims to government programs. An individual violates the False Claims Act (FCA) when he:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

*United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (citing 31 U.S.C. § 3729(a) (2015)). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999).

■ The statute applies to anyone who "knowingly assist[s] in causing the government to pay claims grounded in fraud, without regard to whether that person ha[s] direct contractual relations with the government." *Peterson v. Weinberger*, 508 F.2d 45, 52–53 (5th Cir. 1975). Under the FCA, a person acts "knowingly" with respect to information if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. 3729(b); *see also Longhi*, 575 F.3d at 467.

■ In addition to the statutory requirements, courts have held that a false or fraudulent claim violates the FCA only if the misrepresentation it contains is material. *Longhi*, 575 F.3d at 467; *United States ex rel. Thompson v. Columbia/HCA*

*Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (explaining that the FCA 'interdicts material misrepresentations made to qualify for government privileges and services"); *see also Universal Health Servs., Inc. v. United States*, — U.S. —, 136 S.Ct. 1989, 2002, 195 L.Ed.2d 348 (2016) (holding that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act"). The materiality requirement is a "rigorous one." *Universal Health Servs.*, 136 S.Ct. at 2004, n.6.

The Fifth Circuit has adopted a concise test for false claims liability: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Longhi*, 575 F.3d at 467 (citations omitted).

## C. The Surgery Delegation Scheme

Relators allege that the Surgery Delegation Scheme resulted in MMC and Fulp making false claims to government health payors in violation of the FCA. The MMC Defendants and Fulp argue that they are entitled to summary judgment on this issue because, even if Fulp over-delegated his surgical duties to Santos in certain procedures, claims made for such procedures are not thereby "false or fraudulent claims" under the FCA. Furthermore, they argue that, even if they made false claims, they did not do so with the requisite scienter. Finally, Defendants argue that Relators have failed to identify specific false

claims that were actually made by either of them. The Court addresses each of these arguments in turn.

### 1. False Statement or Fraudulent Course of Conduct

▮▮▮▮ MMC contends that the alleged conduct does not constitute a false claim as a matter of law. "False claims" under the FCA may be either "factually false" or "legally false." *United States ex rel. Bennett v. Medtronic*, 747 F.Supp.2d 745, 765 (S.D. Tex. 2010). "Factually false" claims involve "an incorrect description of goods or services or a request for reimbursement for goods or services never provided." *Bennett*, 747 F.Supp.2d at 765. Alternatively, "legally false" claims arise when a party that submits claims to the government affirmatively certifies compliance with a statute or regulation and the certification is a material condition to receiving a government benefit. *Id.*, at 765–66. In determining whether Defendants submitted false claims under the FCA, the Court examines both theories of falsity.[2]

### a. Factual Falsity

As previously noted, factually false claims involve "an incorrect description of goods or services or a request for reimbursement for goods or services never provided." *Id.* The archetypical example of a factually false claim is when a person bills for a procedure that was never performed. *See*, e.g., *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). A claim may also be factually false where, for example, the claim represents that a certain provider performed the billed-for procedures when

---

**2.** In doing so, the Court notes that "[s]ome commentators have recognized that the distinction between factually and legally false certifications can be both blurry and unhelpful." *U.S. ex rel. Ligai v. ETS–Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *9 (S.D. Tex. Sept. 16, 2014), *aff'd sub nom.*

*U.S. ex rel. Ligai v. ESCO Techs., Inc.*, 611 Fed.Appx. 219 (5th Cir. 2015). However, because the Parties address the various theories of FCA liability in this case along those terms, the Court considers it useful to do so as well, although it considers the distinction to be a logical one, not a legal one.

in fact those services were delivered by an unlicensed provider. *See, e.g., United States ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370 (5th Cir. 2004). Fulp and Santos both argue that Fulp did not submit factually false claims because, even assuming he improperly delegated his surgical duties to Santos, he was still properly designated as the responsible physician for all services on any claims submitted. The MMC Defendants argue that MMC did not submit any factually false claims because they only bill government payors for services rendered as hospitals, and correctly indicated Fulp as the "Operating Provider" on those forms. The Court addresses each argument in turn.

### i. Claims made by Fulp

■ The Parties agree that, as a physician, Fulp submits claims to government healthcare payors under Medicare Part B on the CMS–1500 Health Insurance Claim Form, or its electronic equivalent. *See* (Dkt. No. 182–47). The form contains a certification that the signing physician "certif[ies] that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction." *Id.*, at p. 3. Relators assert that the delegation scheme rendered Fulp's claims false in that they were not "medically indicated and necessary," and that he did not "personally furnish" the services, nor was Santos under his "personal direction" when Santos carried out critical parts of certain procedures. The Court addresses Relators' contentions as to each of these clauses separately.

#### (1) *"Medically indicated and necessary to the health of this patient"*

Relators' evidence in support of their assertion that medical procedures performed in part by Santos were not "medically indicated and necessary to the health

of [the] patient" comes in the form of expert testimony. Dr. James E. Alexander, Jr., provided as sworn statement that "[m]edical procedures performed by persons not qualified or properly trained are considered not medically reasonable or necessary," and that "[g]overnment payors consider any claim submitted for services not reasonable and necessary to be invalid." (Dkt. No. 182–72, ¶¶ 33–35). He also provides a sworn statement that claims submitted by Fulp and MMC for total knee replacements, as well as all claims submitted by Fulp and MMC for procedures for which hospital records reflect that Fulp is in two operating rooms simultaneously, are invalid because the services provided were not "medically reasonable or necessary" as defined by Medicare laws and regulations. *Id.*, ¶¶ 42, 43.

The Court considers Dr. Alexander's statements are an axiom: the performance of surgeries by an untrained, unsupervised, under-qualified scrub technician is neither "medically reasonable" nor "medically necessary" under these circumstances. No further discussion on this issue is merited.

#### (2) *"Personally furnished by me or my employee under my personal direction"*

Fulp and Santos argue that, regardless of the propriety of Fulp's delegation of surgical duties to Santos, the services were at the very least conducted under his "personal direction" as certified on the CMS–1500. In making their argument, Fulp and Santos characterize the issue as one of the degree to which Fulp delegated specific duties and the closeness with which he supervised Santos; they assert in essence that no degree of delegation nor sloppy supervision would make the certification that services were "personally furnished by me or my employee under my personal direction" untrue. The Court disagrees.

The Court has been provided with only limited guidance about what constitutes "personal direction." *But see Peterson v. Richardson*, 370 F.Supp. 1259, 1266 (N.D. Tex. 1973) (finding that testimony from nursing home employees that they did not know that signing physician was medical director of the nursing home, and that they were not given directions from him nor instructed to consult with him on patient care, showed that claims submitted were not for services rendered under the personal direction of a physician and were false); *The Inspector Gen.*, DAB CR40 (1989) (H.H.S. Aug. 22, 1989) (Decision and Order), 1989 WL 509533, at *10 (finding that, for the purpose a certification on an HCFA 1500 form nearly identical to the one at issue, "the definition of personal direction or supervision requires the physician's physical presence during the provision of the items or services"). Persuasive to the Court in interpreting the term is the Texas Occupational Code's statutory provision that "[t]he practice of a surgical assistant is limited to surgical assisting performed under the direct supervision of a physician who delegated the acts." Tex. Occ. Code § 206.251(a). "Direct supervision" in this context is defined as "supervision by a delegating physician who is physically present and who personally directs delegated acts and remains immediately available to personally respond to any emergency until the patient is released from the operating room." *Id.* at § 206.001. Additionally, Relators provide expert testimony from Dr. Alexander that by signing the CMS–1500 certification at issue, "government healthcare payors understand that the provider represents he performed the critical portions of the billed-for services and that he actually directed his employee at all times during the billed-for procedures." (Dkt No. 182–72, ¶ 15).[3] Considering all of these, as well as the plain meaning of the term, the Court considers that "personal direction," at minimum, requires the actual physical presence of the physician personally directing the delegated acts during the provision of the billed-for services. *See The Inspector Gen.*, 1989 WL 509533, at *10; BLACK'S LAW DICTIONARY 557, 1325 (10th ed. 2014) (defining "personal" as "of or affecting a person" and "direction" as "an act of guidance," or "an order; an instruction on how to proceed"). It is without question that a physician is not capable of personally directing delegated acts and being immediately available to personally respond to emergencies if the physician is not physically present with the surgical assistant.

Relators present evidence that, for 389[4] procedures for which Fulp billed a government payor, MMC's OR Logs show that Fulp was in another operating room at the same time that the procedure was ongoing. (Dkt. No. 182–71, ¶ 14, Attach B). Relators argue that, because he was in another operating room during these instances, Fulp could not have personally directed a person performing the billed-for procedure. Fulp argues that these OR Logs do not support a finding that Fulp was out of the room while somebody else performed critical parts of the surgery, because such overlaps in procedures reflected in OR Logs are usually due to a surgeon leaving

3. The Court notes that Defendants have objected to the admissibility of Dr. Alexander's testimony on this issue, and addresses those objections below.

4. In citing this number the Court notes Relators' clarification that their calculations are limited based on the data and information received by Defendants to date, and that they reserve the opportunity to supplement the number of claims made during the specified period—and the resulting statistical analysis of which portion of those claims were likely false—with additional information produced and facts learned.

the room while ancillary work—such as anesthesia or the closure of a surgical wound—occurs. (Dkt. No. 190–1, ¶¶ 10, 12).[5] He argues that evidence of overlapping surgeries in OR Logs is more plausibly explained by this harmless practice and that, as such, it does not support a finding that Santos performed certain billed-for services without Fulp's personal direction. The Court disagrees.

While the Court considers that this evidence is not by itself absolute proof that Santos or another scrub technician performed the billed-for services without Fulp being in the room, the evidence does not stand alone. Relators provide evidence indicating that Fulp had a pattern and practice of allowing Santos to conduct critical aspects of surgeries while Santos was out of the room. In addition to the video evidence previously discussed, Relators present a sworn statement from an MMC surgical technician that she witnessed Santos and Martinez putting an implant in a patient while Fulp was not in the room and that it "became common knowledge among nurses in the operating room that Dr. Fulp had Alex Santos conduct critical parts of his surgeries." (Dkt. No. 182–79, ¶¶ 3–5). Combined with this and other evidence indicating that Fulp had a pattern and practice of allowing Santos to carry out critical parts of surgeries—including total knee replacements—while Fulp was out of the room, the evidence of 389 billed-for procedures in which Fulp was listed as being in another operating room at the same time the surgery was ongoing reasonably supports an inference that, during those surgeries, Fulp allowed Santos or another scrub technician to provide billed-for services that were not under his "personal direction."

Because the Court considers that Relators have presented evidence to allow a reasonable jury to conclude that Fulp allowed Santos/Martinez to perform services while he was not under Fulp's "personal direction," it finds that the evidence presented supports a finding that for at least 389 billed-for procedures Fulp's CMS–1500 forms contained "an incorrect description of goods or services" so as to make his claims factually false. *See Bennett*, 747 F.Supp.2d at 765.

### ii. Claims made by MMC

■ The Parties agree that, as a hospital, MMC submits claims to government healthcare payors under Medicare Part A on a form called the CMS–1450, or its electronic equivalent. (Dkt. No. 182–37).[6] The form contains a representation that "the billing information as shown on the

---

5. Fulp also cites an article from the American College of Surgeons which states that "[o]verlapping surgeries—in which an attending surgeon is responsible for multiple surgeries in multiple ORs at the same time for at least a portion of the procedures—are a fairly common practice and are permitted at many teaching hospitals." American College of Surgeons, *ACS issues a 'wake-up call' on double-booked surgeries*, ADVISORY BOARD (April 15, 2016, 9:37 AM), https://www.advisory.com/daily-briefing/2016/04/15/double-booked-surgeries. However, the Court notes that the cited article also states that "concurrent surgeries—which ACS defines as 'when the critical or key components of the procedures for which the primary attending surgeon is responsible are occurring all or in part at the same time'—on multiple patients in multiple ORs are 'not appropriate'," and that the ACS guidelines–which "generally mirror Medicare's billing regulations" and are not legally binding but have "enormous" influence on surgeons—recommend "tighter governance on the practice," including requiring that surgeons inform patients if they plan to participate in overlapping operations. *Id.* The Court considers that the ACS article and guidelines, far from supporting Fulp's position, indicate a wariness of the ACS regarding overlapping surgeries that the Court finds persuasive.

6. Defendants refer to this form as the "UB–04 Form," which is the same as the CMS–1450. *Compare* (Dkt. No. 182–37) *with* (Dkt. No. 172, 1, p. 6).

face hereof is true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." *Id.* The form contains spaces for the hospital to provide the National Provider Identifier ("NPI")[7] of the "Attending," "Operating," and any "Other" Providers. *Id.* Relators argue that MMC submitted factually false claims by naming Fulp as a provider when he did not actually perform the billed-for procedures. The MMC Defendants argue that MMC did not submit any factually false claims because they only bill government payors for services rendered as hospitals, and because they correctly indicated Fulp as the "Operating Provider" on those forms. The Court addresses each of these contentions in turn.

### (1) Claims submitted as hospitals

The MMC Defendants argue that MMC did not submit factually false claims because they only bill for services provided as hospitals, "such as providing a room and meals, offering nursing care, allowing use of the operating room and other facilities, and supplying medical equipment used in the course of care," not for the services billed for by Fulp as a physician. (Dkt. No. 172, p. 19). The Court does not find this argument persuasive. As described above, the Form requires the biller to certify that "the billing information as shown on the face hereof is true, accurate, and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." (Dkt. 182–37). This certification does not specify that the information only need be complete with respect to the services that the hospital bills for; it requires the hospital to ensure that *all* billing information is true, accurate and complete and that the biller not conceal material facts. Included in the

billing information is the NPI of the Attending Provider and the Operating Provider. Surely the MMC Defendants would concede that had they intentionally provided the NPI of a physician who did not exist, or of a physician who was not the Attending Provider or the Operating Provider, that this would amount to a false claim. Such a falsity would certainly make a claim an incorrect description of goods and services. *See, e.g. United States ex rel. Riley,* 355 F.3d at 370; *Peterson,* 370 F.Supp. at 1266. Accordingly, the Court rejects the MMC Defendants' argument that they could not, as a matter of law, have presented facially false claims because they only billed for services provided as a hospital, and moves on to whether Relators have provided evidence that MMC submitted forms with false billing information.

### (2) Naming Fulp as the "Operating Provider"

The MMC Defendants argue that their claims are not factually false because the CMS–1450 only requires the hospital to list which doctor is the "Operating Provider," and does not contain the same certifications as the CM–1500. (Dkt. 172, p. 12). According to the Medicare Claims Processing Manual, the "Operating Provider" item requires the hospital to provide the name and NPI of the "individual with the primary responsibility for performing the surgical procedure(s)." CENTERS FOR MEDICARE & MEDICAID SERVICES, MEDICARE CLAIMS PROCESSING MANUAL, PUB. No. 100–04, [CHAPTER 25—COMPLETING AND PROCESSING THE FORM CMS–1450 DATA SET [hereinafter CMS No. 100–04, Ch. 24], FL 77 (Rev. 3435, 2015). Unlike the CMS–1500 Form used by physicians, the CMS–1450 does not certify that the services were rendered personally or under the personal direction

---

7. An NPI is a unique ten-digit number that is only provided to licensed health care provid-

ers. *U.S., ex rel. Johnson v. Kaner Med. Grp., P.A.,* 641 Fed.Appx. 391, 392 (5th Cir. 2016)

of the named physician. (Dkt. No. 182–37). Thus, the MMC Defendants argue, even viewing all Relators' evidence in the light most favorable to them, naming Fulp as the "Operating Physician" is not an incorrect description.

The MMC Defendants argue that, even if Fulp allowed Santos or any other surgical assistant to perform critical parts of procedures, Fulp still maintained "primary responsibility" for those procedures because he was "ultimately accountable for a course of conduct," thereby making the claim factually accurate. (Dkt. 172, p. 10–11) (citing WEBSTER's NEW INT'L DICTIONARY 2124 (2d ed. 1941)). They argue that, accepting Relators' allegations as true, Fulp "was the licensed surgeon designated for each case," "was present for part of every procedure," "performed part of each procedure," "was the surgeon with principal oversight for each procedure," and "would have been subject to accountability at law for any complications" arising out of each procedure and that, therefore, he remained the person with "primary responsibility" over it for purposes of the claim. *Id.*, at 11. Given the plain meaning of the word "responsibility," the Court considers that only the last two factors—Fulp's oversight and accountability for the procedures—are relevant.[8] However, the Court does not consider that, viewing the evidence in the light most favorable to the Relators, Fulp would have been "subject to accountability at law for any complications," as the MMC Defendants assert.

The Court finds Texas law regarding physician delegation to be persuasive in determining whether Fulp necessarily had "primary responsibility" over the surgeries or, as is here alleged, he completely abdicated responsibility. The Texas Occupational Code provides that "[a] physician may delegate to a qualified and properly trained person acting under the physician's supervision any medical act that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate," and, in doing so, "[t]he delegating physician remains responsible for the medical acts of the person performing the delegated medical acts." Tex. Occ. Code § 157.001(a)–(b). However, while the Occupational Code explicitly states that the Texas Medical Board "shall promote a physician's exercise of professional judgment to decide which medical acts may be safely delegated by not adopting rules containing, except as absolutely necessary, global prohibitions or restrictions on the delegation of medical acts," in the case of surgical assistants, the Medical Board has adopted such a restriction. *Id.* at § 157.006. Texas law states that "[t]he practice of surgical assisting is limited to surgical assisting performed under the direct supervision of a physician who delegates the acts." 22 Tex. Admin. Code § 184.12. It goes on to specify that:

> Supervision shall be continuous, and shall require that the delegating physician be physically present and immediately available in the operating room to personally respond to any emergency until the patient is released from the operating room and care has been transferred to another physician. Telecommunication is insufficient for supervision purposes.

*Id.*, at § 184.13. Additionally, "[i]t is the obligation of each team of physician(s) and surgical assistant(s) to ensure that," among other things, "the surgical assistant's scope of practice is identified," and "delegation of medical tasks is appropriate to the surgical assistant's level of competence." *Id.* That is, both Fulp and Santos—not Fulp alone—were responsible for en-

---

8. *See* BLACK's LAW DICTIONARY, 1506 (10th ed. 2014) (defining "responsibility" as "the quali- ty, state or condition of being answerable or accountable").

suring that Santos did not conduct surgical tasks outside of Fulp's presence. When Fulp walked out of the operating room to start his next surgery or take a nap, as the Relator's summary judgment evidence indicates, Fulp abdicated his responsibility, leaving his scrub techs unsupervised and with the responsibilities of performing, commencing and/or completing the surgeries he had scheduled. *See* (Dkt. No. 182–77, ¶¶ 14–15).

Considering Texas law regarding physician delegation, the Court considers that—at least for those surgeries which Fulp allowed Santos/Martinez to conduct portions of surgeries while Fulp was not in the operating room, as well as surgeries in which Fulp was present but his supervision of Santos/Martinez was not "continuous," his delegation to Santos/Martinez was outside of their scope of practice. *See* 22 Tex. Admin. Code § 184.13. Furthermore, because Fulp and MMC maintain that Fulp had no reason to believe that Santos/Martinez lacked the competency to perform the surgical tasks that Fulp delegated to him, the Court considers that, under Texas law, Fulp would not be liable for any of Santos's acts during those surgeries. *See id.*, at § 157.060. Even if the provision regarding physician liability for delegated acts of physician assistants and registered nurses does not apply in Santos's case, the Court considers that it was the responsibility of Fulp and Santos—not Fulp alone—to ensure that Santos was operating within the scope of his position during the procedure. *See id.*, at 184.13. Accordingly, the Court cannot find as a matter of law that Fulp was "the individual with the primary responsibility for performing the surgical procedure(s)." CMS No. 100–04, Ch. 24, FL 77.[9] It is a non sequitur to suggest that Fulp was primari-

ly responsible for, *inter alia*, inserting a screw, or stitching up a patient while he was in another operating room commencing another surgery or in the physicians' lounge napping. When Fulp was not in the OR, he abdicated his responsibility for performing all surgical procedures and Santos/Martinez assumed those responsibilities. While the Defendants may characterize this as a proper delegation of responsibilities, the Court disagrees for the reasons stated *infra*.

### (3) All other Factual Assertions on the CMS–1450

Finally, the Court sees it unfit to grant summary judgment on this issue because MMC has not satisfied its initial burden of demonstrating that it is entitled to summary judgment on Relators' assertions that it submitted factually false claims. Specifically, MMC has not demonstrated the absence of a genuine issue of material fact as to how MMC identified Fulp when billing for the procedures at issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(a), (c). As indicated by the Parties at the April 4 Status Conference, the MMC Defendants have not provided Relators with the *actual claim information* submitted to government payors during the period at issue, but instead identified a set of procedures as those billed to a government payor. That is, MMC has identified which procedures resulted in claims, but has not identified the factual assertions it made in any of those claims. Although the Court finds that Fulp was not necessarily the "Operating Provider" for each of the procedures covered in the Second Amended Complaint as a matter of law, this finding is only based on the MMC Defendants' unsubstantiated asser-

---

9. This standard does not seek a determination of who might be liable in tort for negligence in performing the surgical procedure but

seeks the identification of the person who was primarily responsible for actually performing the surgical procedure.

tion that MMC only named Fulp as the Operating Provider on all relevant CMS–1450 Forms. MMC does not provide any evidence that Fulp was listed as the "Operating Provider" on all—or even any—of the claims at issue. It further does not provide any evidence as to which provider—if any—was listed as the "Attending Provider," defined as "the individual who has overall responsibility for the patient's medical care and treatment reported in this claim/encounter," or any "Other Provider," which could include a "Referring Provider" ("The provider who sends the patient to another provider for services"), a "Rendering Provider," ("The health care professional who delivers or completes a particular medical service or non-surgical procedure."), and any "Other Operating Physician" ("An individual performing a secondary surgical procedure or assisting the Operating Physician"). CMS No. 100–04, Ch. 24, FL 77. Indeed, the only basis by which the Court could presume that the only portion of the CMS–1450 Form relevant to the underlying procedure for all of the claims in the covered time period is MMC's own unsubstantiated assertion. Because the Court considers that, for example, naming Fulp or failing to name Santos as one of the "Other Providers" may render a claim factually false, it finds that MMC has not demonstrated that it is entitled to summary judgment as to the factual falsity of *any* of the assertions it made on the CMS–1450—not just the assertion that Fulp was the "Operating Physician."

### b. Legal Falsity

Relators also allege that Defendants submitted legally false claims. So-called "legally false" claims may arise in two ways. The first occurs when a party submits a claim to the government and, in doing so, affirmatively certifies compliance with a statute, regulation, or contract requirement that is a material condition of payment. *United States ex rel. Bennett v.*

*Medtronic,* 747 F.Supp.2d 745, 765–66 (S.D. Tex. 2010). The second is when a party submits a claim to the government and fails to disclose a violation of relevant statutes, regulations, or contract requirements that are material conditions of payment. *Universal Health Servs., Inc. v. United States,* —— U.S. ——, 136 S.Ct. 1989, 1993, 195 L.Ed.2d 348 (2016). Under this second theory, the so-called "implied certification theory," the payment request itself is treated as an implied certification of compliance with all relevant statutes, regulations, and contract requirements that are material conditions of payment, and any failure to disclose a violation is treated as a misrepresentation that renders the claim "false or fraudulent" under the FCA. *Id.* While Defendants argue that "the Fifth Circuit has never recognized the implied certification theory," (Dkt. 172, p. 17), binding precedent from the Supreme Court has found FCA liability under this theory at least when two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations "misleading half-truths." *Universal Health Servs., Inc.,* 136 S.Ct. at 2001.

#### i. False Certifications Identified by Relators

█ In support of their claim, Relators argue that MMC and Fulp falsely certified compliance with health care laws and regulations in three different ways: (i) in CMS Provider Agreements filed annually by MMC, (ii) in Annual Cost Reports filed by Fulp and MMC, and (iii) in the EDI Enrollment Forms MMC and Fulp signed to enroll as providers.

To enroll as Medicare providers, MMC and Fulp were required to sign a Provider Agreement. (Dkt. Nos. 182–40; 182–70). The CMS Provider Agreement contains a number of certifications, one of which reads as follows:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier ... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

(Dkt No. 182–70, p. 2).

Medicare rules also require that MMC file an annual cost report, which MMC did for each relevant year, from 2009 through 2013. (Dkt. No. 182–38). The cost reports contain a certification that states: "I ... certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." *Id.*

Finally, the Parties agree that Fulp and MMC submitted EDI Enrollment Forms in order to be able to submit claims electronically using a third party known as a Medicare Administrative Contractor, or MAC. CENTERS FOR MEDICARE & MEDICAID SERVICES, MEDICARE CLAIMS PROCESSING MANUAL, PUB. NO. 100–04, CHAPTER 24—GENERAL EDI AND EDI SUPPORT REQUIREMENTS, ELECTRONIC CLAIMS, AND MANDATORY ELECTRONIC FILING OF MEDICARE CLAIMS, § 30.2 (Rev. 3404, 2015); *see also, id.* at § 10.4 (Rev. 3346, 2015) (Defining MAC). The MAC Enrollment from must include at least 15 specific certifications with which the provider must agree, including "[t]hat the CMS–assigned unique identifier number

(submitter identifier) or NPI constitutes the provider's legal electronic signature and constitutes an assurance by the provider that services were performed as billed." *Id.*, at § 30.2 (Rev. 3404, 2015). The provider's signatory must also certify that she has "been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare Program ... and to commit the provider to abide by the laws, regulations and the program instructions of Medicare." *Id.*, at § 30.4 (Rev. 3404, 2015).

## ii. Conditions of payment vs. conditions of participation

The MMC Defendants argue that none of the certifications listed above give rise to FCA liability because none of them explicitly provides that it is a Medicare condition of payment. They argue that these certifications constitute a "classic example of a general promise to follow all the laws," which, if it gives rise to FCA liability, "would transform *every last* Medicare rule into a lurking pit of treble-damages FCA liability." (Dkt. No. 172, p. 25) (emphasis in original). In order to avoid such a result, Defendants urge, the Court should follow a line of cases reading the aforementioned certifications as predicating payment on compliance only with the Stark Law and AKS, and not with any other laws or provisions. Defendants' arguments on this point fall short because they rely on a line of reasoning that conflicts with Fifth Circuit and Supreme Court precedents.

In contending that the certifications at issue do not give rise to conditions of participation, Defendants rely heavily on two cases: *United States ex rel. Wall v. Vista Hospice Care, Inc.* and *United States ex rel. Parikh v. Citizens Medical Center*. In *Wall*, the relators alleged that the defendant-hospice submitted legally false claims when they failed to comply

with certain conditions of Medicare participation. *U.S. ex rel. Wall v. Vista Hospice Care, Inc.,* 778 F.Supp.2d 709, 717 (N.D. Tex. 2011). Namely, the relators claimed that the hospice did not consistently provide physical therapy, occupational therapy, and speech-language pathology services as required by Medicare regulations. *Id.* at 720. They additionally claimed that the hospice did not hold mandatory meetings or follow certain other administrative requirements. *Id.* at 721. The relators argued that, by signing the CMS Provider Agreement, which—like the one at issue in this case—contained a certification that "payment of a claim by Medicare is conditioned ... on the provider's compliance with all applicable conditions of participation in Medicare," the hospice provider agreed to just that: that payment is conditioned on compliance with the applicable conditions of participation. *Id.* However, the Court in *Wall* rejected this plain meaning of the Provider Agreement. It reasoned that:

if merely signing this form converts a condition of participation into a condition of payment, then *every* hospice provider not fully complying with all conditions of participation may be held liable under the FCA, thus undermining the distinction between conditions of payment and participation, as well as Medicare's internal administrative structure to deal with violations of conditions of participation. To so hold would burden federal courts with what should be administrative determinations of whether medical services were performed in compliance with Medicare statutes and regulations governing participation. Courts are not the place where such issues are to first be resolved. Therefore, although the [CMS Provider Agreement] purports to condition payment on compliance with "all applicable conditions of participation," this Court does not read that form as mandating an extension of FCA

liability to every statement certifying compliance with any Medicare statute or regulation relating to conditions of participation.

*Id.* at 721.

Similarly, in *U.S. ex rel. Parikh v. Citizens Med Ctr.,* the relators argued that the defendant-hospital submitted false claims when they conditioned physician privileges at the hospital on economic criteria, such as by number of referrals, when they were required by Medicare rules to "ensure the criteria for selection [of medical staff] are individual character, competence, training, experience, and judgment" as per the certification agreement. *U.S. ex rel. Parikh v. Citizens Med. Ctr.,* 977 F.Supp.2d 654, 676 (S.D. Tex. 2013) *aff'd sub nom. U.S. ex rel. Parikh v. Brown,* 587 Fed.Appx. 123 (5th Cir. 2014). In reviewing whether the same Provider Agreement "converts the conditions of participation into conditions of payment that can invoke FCA liability," the court cited the logic in *Wall,* finding "*Wall's* concern that Relators' argument would convert all conditions of participation into conditions of payment to be well-placed." *Id.,* at 676–77. The court further found that:

[a]ccepting Relators' argument would allow FCA liability to attach any time a condition of participation is violated (even if, as in this case, the condition is a vague guideline requiring the defendant to "ensure" that medical staff are selected by various merit-based criteria) and could drastically expand the role of the courts in policing regulations in an area traditionally governed by administrative agencies.

*Id.,* at 677. It dismissed the relators' FCA allegations based on "Medicare's conditions of participation" without further discussion. *Id.*

While the MMC Defendants cite many more cases following the logic in *Wall* and

*Parikh*, the Court need not discuss them here. The same basic logic controls in all of Defendants' cited cases: that courts should not read the CMS Provider Agreement "as mandating an extension of FCA liability to every statement certifying compliance with any Medicare statute or regulation relating to conditions of participation." *See Wall*, 778 F.Supp.2d at 720. The MMC Defendants cite this reasoning for the certifications found in the EDI Enrollment Form and Annual Cost Reports. Defendants argue that, because *Wall* and *Parikh* found that certifying compliance with all Medicare rules and regulations did not create FCA liability for the violation of *any and all* Medicare rules and regulations, such certifications do not create FCA liability for the violation of *any* Medicare rules and regulations. Such a contention ignores the plain meaning of the certifications and the reasoning in *Wall* and is contrary to controlling precedent in this Circuit and the Supreme Court.

As explained above, the CMS Provider Agreement certification contains three specific parts: (1) the applicant agrees to abide by Medicare laws, regulations, and program instructions; (2) the applicant understands that payment by Medicare is conditioned on complying with the aforementioned rules as well as the AKS and Stark Law, and (3) the applicant understands that payment by Medicare is also conditioned on compliance with applicable conditions of participation. The Court in *Wall* held that it "does not read that form as mandating an extension of FCA liability to every statement certifying compliance with any Medicare statute or regulation relating to conditions of participation." *U.S. ex rel. Wall*, 778 F.Supp.2d at 721. In doing so, it went on to say that "the Court does not foreclose the possibility that falsely certifying that certain services were performed may violate a condition of payment under Medicare," and allowed the relators to re-plead their complaint to "sat-

isfy the materiality requirement of an FCA allegation by pleading what specific services are conditions of payment that were not met." *Id.* That is, *Wall* supports the contention that general agreements to adhere to Medicare rules do not expose a claimant to FCA liability for *every* violation of Medicare rules, but does not foreclose liability for *certain* violations of Medicare rules that are material to the government's decision to pay.

Reading *Wall* to allow liability for material violations of Medicare rules and regulations comports with precedent set by the Fifth Circuit and the Supreme Court. Long before *Wall*, the Fifth Circuit held without qualification in *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.* that "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." 125 F.3d 899, 902 (5th Cir. 1997). In the CMS Provider agreement, the government explicitly conditioned payment of a claim upon MMC's and Fulp's compliance with (1) Medicare laws, regulations, and program instructions, (2) the AKS and Stark Law, and (3) all applicable conditions of participation. Thus, insofar as MMC and Fulp violated any of these in the underlying transaction, they submitted a false claim.

Furthermore, in rejecting Defendants' reading of *Wall* and *Parikh*, the Court relies on the Supreme Court's explicit rejection of lower courts' over-reliance on the phrases "condition of payment" and "condition of participation" as used in Medicare certifications. In *Universal Health Services, Inc. v. United States ex rel. Escobar*, the Court found that "False Claims Act liability for failing to disclose

violations of legal requirements does not turn on whether those requirements were expressly designated as conditions of payment." —— U.S. ——, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016). Likewise, "even where a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability." *Id.* The most important inquiry, then, is "not what label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* Whether a provision is labeled a condition of payment or a condition of participation is relevant to, but not dispositive of, the materiality inquiry. *Id.*

Nor is the concern laid out in *Wall* and *Parikh*—and repeated here by Defendants—that finding a "false or fraudulent claim" when any Medicare condition of participation is violated will "burden federal courts with what should be administrative determinations of whether medical services were performed in compliance with Medicare statutes and regulations governing participation" a valid one. *See Wall,* 778 F.Supp.2d at 721. This, too, was addressed by the Court in *Universal Health.* In rejecting the provider's argument that "False Claims Act liability should be limited to undisclosed violations of expressly designated conditions of payment to provide defendants with fair notice and to cabin liability," the Court found that "nothing in the text of the [FCA] supports" such a proposed restriction, and that "policy arguments cannot supersede the clear statutory text," but that, at any rate, the concern over rampant liability for violations of obscure Medicare regulations was allayed by the Act's materiality requirement. 136 S.Ct. at 2001–02. "[I]nstead of adopting a circumscribed view of what it means for a claim to be false or fraudulent," the Court found that "concerns about fair notice and open-ended liability

can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." *Id.* (internal citations omitted).

Indeed, although the Parties seem to assume that Fulp's and MMC's liability hinges on their explicit promise to abide by certain applicable rules and regulations, the Court reads *Universal Health Services* as embracing FCA liability even without such certifications. The Court interpreted the FCA as incorporating the common-law definition of "fraud," finding that certain misrepresentations by omission can give rise to FCA liability. *Id.,* at 1999. It held that claims demanding payment, but which state the truth "only so far as it goes, while omitting critical qualifying information," can be actionable misrepresentations under the statute. *Id.,* at 2000. The Court went on to find that the claims at issue in that case were such actionable half-truths.

In *Universal Health Services,* the provider mental health facility had "few ... employees [that] were actually licensed to provide mental health counseling and ... supervision of them was minimal." *Id.,* at 1997. One billing practitioner identified herself as a psychologist with a Ph.D., but failed to mention that her degree came from an unaccredited college and that Massachusetts had rejected her application to be licensed as a psychologist. *Id.* Another practitioner, who prescribed medications, held herself out as a psychiatrist, but was in fact a nurse who lacked authority to prescribe medications absent supervision. *Id.* Additionally, "[r]ather than ensuring supervision of unlicensed staff, the clinic's director helped to misrepresent the staff's qualifications." *Id.* The Court found that:

by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided

individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, Arbour staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context. Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. § 429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, § 429.424(C). By using payment and other codes that conveyed this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.

*Id.*, at 2000–01.

As in *Universal Health Services*, the Court finds that, by submitting claims for payment for surgical services, MMC and Fulp represented that compliance with material Medicare regulations. The Court finds that this to be true whether or not Fulp and MMC had signed the CMS provider agreements. The Court further finds that the compliance certifications signed by Fulp and MMC give rise to a false claim if Fulp or MMC failed to comply with "laws and regulations regarding the provision of health care services," including but not limited to "Medicare laws, regulations, and program instructions." Accordingly, the Court next addresses Defendants' contention that Relators have failed to show that the delegation scheme

violated any state or federal healthcare laws or regulations.

### iii. Violations of State and Federal Healthcare Laws

Relators allege that the delegation scheme violated state and federal laws and regulations limiting the role of a scrub technician and the degree to which a physician may delegate surgical duties to such a technician. Defendants argue that the delegation scheme violated neither Texas law nor any Medicare rules and regulations. The Court addresses Texas law and Medicare rules and regulations separately.

#### (1) Violations of Texas Law

Defendants assert that, because Texas law anticipates a broad delegation by physicians to surgical assistants, Relators cannot show that Fulp's delegation of duties to Santos was a violation of Texas healthcare law. The Court disagrees.

The MMC Defendants, Fulp, and Santos argue that, because Texas regulations provide that "[a] physician may delegate to a qualified and properly trained person acting under the physician's supervision any medical act that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate," Fulp was given wide discretion to delegate surgical duties to Santos. (Dkt. No. 172, p. 30) (citing Tex. Occ. Code Ann. § 157.001). They emphasize that the relevant laws "anticipate broad delegation by physicians to [surgical assistants], creating a standard of reasonableness in delegation rather than hard-and-fast rules." *Id.* (citations omitted). They further provide testimony from Fulp that he subjectively believed that he could safely delegate surgical duties to Santos. (Dkt. No 172–1, pp. 45–6, 147:9–10, 150:14–18). However, the Court considers that—for procedures in which Santos conducted any duties while Fulp was not both in the room and scrubbed in, and in which Santos conducted any duties that were not merely "technical functions"

even if Fulp was in the room—Santos and Fulp violated state laws and regulations governing surgical technicians.

As discussed above, Texas regulations require that "[t]he practice of surgical assisting is limited to surgical assisting performed under the direct supervision of a physician who delegates the acts." 22 Tex. Admin. Code § 184.12. Furthermore:

> [s]upervision shall be continuous, and shall require that the delegating physician be physically present and immediately available in the operating room to personally respond to any emergency until the patient is released from the operating room and care has been transferred to another physician. Telecommunication is insufficient for supervision purposes.

*Id.*, at § 184.13. Also as discussed above, Relators provide evidence that, for thousands of procedures, Fulp was listed as being in another operating room at the same time the surgery was ongoing. They also present evidence in the form of a video and testimony that supports an inference that Fulp regularly and routinely left the operating room to allow Santos to perform parts of procedures without Fulp's physical presence or immediate availability. This evidence reasonably supports an inference that, during those surgeries in which Fulp was listed as being in another operating room at the time the surgery was ongoing, Fulp allowed Santos or another scrub technician to provide billed-for services that were not under his "direct supervision" in violation of Texas health care laws.

Defendants also argue that at least "delegation is clearly permissible under state and federal law when *the physician is physically present in the operating room.*" (Dkt. No. 172, p. 32) (emphasis in original) (citations omitted). This is an overstatement of the law; Fulp's mere presence in the operating room is not all that is re-

quired. As the Court discussed above, "direct supervision" requires not only the physician's physical presence but also the physician be "immediately available in the operating room to personally respond to any emergency until the patient is released from the operating room and care has been transferred to another physician." 22 Tex. Admin. Code § 184.13. While Defendants argue that this does not require that Dr. Fulp be scrubbed into a surgical procedure, such an assertion is unsupported. The Court simply cannot fathom, and the Defendants have not explained, how it is that a doctor who is present in the operating room but not within the sterilized environment of being scrubbed into a procedure can be "immediately available" to "personally respond to an emergency." *See id.*

Finally, the Court considers that Relators provide evidence that Santos carried out surgical tasks outside of the scope of those permitted under Texas law. As described above, Relators have presented evidence that Santos regularly performed the critical parts of knee replacement surgeries. A surgical assistant's practice is limited to "surgical assisting," which Texas law defines as "providing aid under direct supervision in exposure, hemostasis, and other intraoperative technical functions that assist a physician in performing a safe operation with optimal results for the patient, including the delegated authority to provide local infiltration or the topical application of a local anesthetic at the operation site." Tex. Occ. Code § 206.001(6). The Court notes that this definition limits a surgical assistant's duties to a set of intraoperative "technical functions," such as closing up wounds and providing local anesthesia. Defendants have not explained—and the Court cannot see—how such "technical functions" could include the critical surgical act of removing a patient's knee and replacing it with a synthetic one. As addressed above, Texas law

puts the burden on physicians and surgical assistants to ensure that the surgical assistant is operating within the scope of his duties. Accordingly, Fulp and Santos violated· Texas law each time Santos carried out the critical portions of a knee replacement himself, whether or not Fulp was in the room and scrubbed in.

### (2) Violations of Medicare Rules and Regulations

Defendants' argument that the delegation scheme did not violate Medicare regulations is essentially the same as their argument that state law was not violated: they assert that, because Medicare rules anticipate a broad delegation of duties by physicians to scrub technicians, Relators cannot show that the Fulp's delegation of duties to Santos/Martinez was a violation of Medicare rules and regulations. The Court disagrees.

Defendants only cite one Medicare rule in support of their position. They argue that Medicare rules allow non-physicians to render services under the direct supervision of a physician, meaning "that the [physician] must be immediately available to furnish assistance and direction," but not does not "mean that the [physician] must be present in the room when the procedure was performed." (Dkt. No. 172, p. 30) (citing 42 C.F.R § 410.27(a)(1)(iv)–(a)(1)(iv)(A)) (alteration in original). However, as Relators point out, Defendants' citation of this regulation is somewhat misleading; it applies only to "services and supplies furnished to hospital or [Critical Access Hospital] outpatients," not to the inpatient surgical procedures at issue in this case. 42 C.F.R. § 410.27(a).[10]

Meanwhile, Relators have identified at least two Medicare conditions of payment

that they assert were violated by the surgical delegation scheme. Medicare regulations require that, as a condition of participation, the hospital "must assure that personnel are licensed or meet other applicable standards that are required by State or local laws." 42 C.F.R. § 482.11. The regulations also require that "[s]urgical privileges must be delineated for all practitioners performing surgery in accordance with the competencies of each practitioner." 42 C.F.R. § 482.51. Medicare's interpretive guidelines state that:

> [i]f the hospital utilizes RN First Assistants, surgical PA, or other non-MD/DO surgical assistants, the hospital must establish criteria, qualifications and a credentialing process to grant specific privileges to individual practitioners based on each individual practitioner's compliance with the privileging/credentialing criteria and in accordance with Federal and State laws and regulations. This would include surgical services tasks conducted by these practitioners while under the supervision of an MD/DO.

CENTERS FOR MEDICARE & MEDICAID SERVICES, STATE OPERATIONS MANUAL, PUB. NO. 100–07, APPENDIX A–SURVEY PROTOCOL, REGULATIONS AND INTERPRETIVE GUIDELINES FOR HOSPITALS, A–0945 (Rev. 151, 2015). Further, the guidelines require that:

> Surgery and all surgical procedures must be conducted by a practitioner who meets the medical staff criteria and procedures for the privileges granted, who has been granted specific surgical privileges by the governing body in accordance with those criteria, and who is working within the scope of those granted and documented privileges.

*Id.*[11] As described above, the Court considers that Relators have provided evidence

---

**10.** While the Court cannot discern from the evidence before it whether the surgical procedures at issue were inpatient or outpatient procedures, Relators argue in their response

that they were inpatient surgical procedures, and no Defendant has indicated otherwise.

**11.** Relators also point to Medicare regulations requiring that providers must ensure

that Santos operated outside of his specific privileges and in violation of Texas law. Accordingly, it considers that evidence to also support an inference that Medicare regulations requiring that surgical personnel meet the requirements of state law and that surgical technicians operate within the scope of those requirements were also violated by the delegation scheme.

Because the Court finds that Relators have provided evidence that the delegation scheme violated both state law and Medicare regulations, it considers that a reasonable factfinder could conclude that the claims for payments submitted to the various government payors by MMC and Fulp for the underlying surgeries were legally false. Having found evidence that MMC's and Fulp's claims were both legally and factually false, the Court next considers Defendants' argument that Fulp did not submit false claims with the requisite scienter.

## 2. Scienter

 Defendants Fulp and Santos argue that, even considering all of Relators' allegations as true, they may not be held liable under the FCA because they did not act with the requisite scienter.[12] The FCA imposes liability on "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a). The Act defines "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of truth or falsity of the information," or "acts in reckless disregard of the

truth or falsity of the information." § 3729(b)(1)(A).

To support their argument that they lacked the requisite scienter, Fulp and Santos cite *United States ex rel. Taylor-Vick v. Smith* for the proposition that "[i]t is a long-established rule of this Circuit to show a violation of the FCA, the evidence must demonstrate guilty knowledge of a purpose on the part of the defendant to cheat the Government, or knowledge of guilty intent." 513 F.3d 228, 231 (5th Cir. 2008). They provide testimonial evidence from Dr. Fulp that, while he does review the "operative report," he does not review individual bills before they go to Medicare and does not take patients based on whether their care can be billed to government payors. (Dkt. No. 175-2, 31:22–32:1; 143:9–16). Through this evidence, Santos and Fulp seem to contend that there can be no FCA liability for any false claims made by Fulp because he did not intend to cheat, specifically, government payors out of any money.

The Court finds this evidence to be unpersuasive. Fulp does not articulate an argument that he did not know that the Surgery Delegation Scheme was improper, or that he did not know the government would reject claims if it knew such claims were for surgeries performed in whole or in part by an unsupervised scrub technician. Instead, he seems to argue that, because he does not know *which* surgeries were submitted for payment to government payors, and did not intentionally seek patients based on Medicare, Medicaid or

---

that services billed under Medicare "will be of a quality which meets professionally recognized standards of health care." 42 U.S.C.A. § 1320c–5. Relators have provided some evidence that the provision of much of the surgical responsibilities undertaken by Santos/Martinez do not meet professionally recognized standards of health care.

**12.** The MMC Defendants do not present an argument that they lacked the requisite scienter for FCA liability for claims rendered false because of the surgical delegation scheme. However, they do argue that they lacked requisite scienter regarding the Device Scheme. The Court addresses those arguments below.

Tricare eligibility, he cannot be held liable under the FCA.

In making this assertion, Fulp and Santos misunderstand the FCA's scienter requirement. Under the FCA, Relators do not need to prove that Fulp specifically intended to defraud the government. 31 U.S.C. § 3729(b)(1)(B); *Universal Health Servs., Inc.*, 136 S.Ct. at 1999. Rather, the FCA makes explicit that a defendant can act "knowingly" with respect to information if he has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A); *see also United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) ("Though the FCA is plain that 'proof of specific intent to defraud' is not necessary, . . . [the FCA's] *mens rea* requirement is not met by mere negligence or even gross negligence.").

Relators present substantial evidence to support their claim that Fulp and Santos knew that the Surgery Delegation Scheme was improper. For example, Relators provide evidence that, after he was reported to MMC management for allowing Santos to carry out parts of procedures unsupervised, Fulp tried to intimidate witnesses by putting up several copies of a flyer calling those that reported him "rats" and "bottom dwellers." (Dkt. No. 182–7). Relators also provide testimony from MMC nurse Elizabeth Meza that on one occasion she observed Santos and another surgical assistant putting in an implant while Fulp was not in the operating room. (Dkt. 182–79, ¶ 4). On this occasion, when Dr. Fulp returned to the operating room, Ms. Meza told him that "he cannot abandon his patient," to which "Fulp responded by yelling at [her] in an abusive manner." *Id.* Additionally, and persuasively, MMC records indicate that, after a surgical assistant nicked a patient's femoral artery, MMC

Administration and the OR Nurse Director met with Dr. Fulp and he "acknowledged [the surgical assistant] was performing beyond his approved competency." (Dkt. 182–55). As to Santos, the official letter in his file regarding his resignation reflects that Santos was warned in 2012 about allegations that he was performing procedures outside of his "practice parameters." (Dkt. No. 182–9). After that warning, MMC was provided with the video evidence showing Santos making bone cuts and using cautery equipment during a procedure while Fulp was absent from the operating room. *Id.* The letter also stated that, "it appears that Mr. Santos' responses to the inquiries in 2012 when the matter was initially investigated were not candid and forthcoming." *Id.*

Viewing all of this evidence in the light most favorable to the non-moving party, the Court considers that Relators have provided sufficient evidence to allow a reasonable juror to find by a preponderance of evidence that Fulp and Santos both held actual subjective knowledge the delegation scheme was improper. Furthermore, neither Fulp nor Santos denies that he knew that some or all of the procedures in which they acted improperly were to be billed to government payors, or that the government would not pay the claims if they knew that Santos performed critical parts of the underlying procedures without proper supervision. Accordingly, the Court considers that Relators have provided sufficient evidence to establish a genuine dispute as to whether Fulp "knowingly" submitted false claims under the FCA.

### 3. Materiality

■ A fraudulent claim only violates the FCA if it is material. See *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (explaining that the FCA 'inter-

dicts material misrepresentations made to qualify for government privileges and services") (internal citations and quotations omitted). As explained above, the Supreme Court has held that, rather than "adopting a circumscribed view of what it means for a claim to be false or fraudulent," Defendants' concerns about fair notice and open-ended liability "can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." *Universal Health Servs., Inc.*, 136 S.Ct. at 2002 (internal quotation marks omitted). Accordingly, "those requirements are rigorous." *Id.*

■■■■ Because the False Claims Act is not "an all-purpose antifraud statute," or a "vehicle for punishing garden-variety breaches of contract or regulatory violations," "a misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* Nor is it sufficient that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. *Id.* Similarly, "materiality cannot be found where noncompliance is minor or insubstantial." *Id.* The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money. 31 U.S.C. § 3729(b)(4). Thus, the crux of the inquiry is whether or not the misrepresentation would influence the government's decision to pay the claim.

■■■■ No Defendant has argued that the false or fraudulent statements discussed above were immaterial to the government's decision to pay, and the Court observes that the false or fraudulent claims at issue in the instant case are far from the type of "minor or insubstantial" claims addressed by the Supreme Court in *Universal Health Services. See, e.g.*, 136 S.Ct. at 2004 (rejecting the government's propo-

sition that a material falsity occurs when a claimant falsely certifies compliance with a requirement that contractors buy American-made staplers). Relators have provided evidence that MMC and Fulp failed to comply with some of Medicare's most basic requirements: that "personnel are licensed or meet other applicable standards that are required by State or local laws," that "[s]urgical privileges ... be delineated for all practitioners performing surgery in accordance with the competencies of each practitioner," and that care "meets professionally recognized standards of health care." *See* 42 C.F.R. §§ 482.11; 482.51; 1320c–5. Furthermore, Relators have provided evidence in the form of expert testimony that support an inference that the government would not have paid the claims if they knew that the underlying violations had occurred. *See* (Dkt. No. 182–72, ¶¶ 40–44).

Because the Court considers that Relators have demonstrated a genuine issue of material fact as to whether the claims made by Fulp and MMC were materially false, it goes on to address Defendants' contention that Relators have failed to show evidence of specific false claims made to a government payor.

### 4. Actual Claims

■■■■ Defendants argue that Relators have failed to provide evidence of any false claims that were actually made to government payors. In making this argument Defendants erroneously rely on the proposition that Relators can prosecute only those claims identified in their Second Amended Complaint. The MMC Defendants also make the wholly unsubstantiated assertion that evidence of a "pattern and practice" of fraudulent behavior resulting in false claims can never lead to FCA liability. Furthermore, Defendants make the questionable assertion that,

"even if the Court sustains one or more of [the] individual alleged false claims, the *rest* of Relators' bloated case should be thrown out because there is no recovery under the FCA for supposed, as opposed to actual, false claims. And here, there is *no* valid basis for expanding beyond the specific FCA violations that were personally observed by Relators and their witnesses." (Dkt. No. 172, p. 17) (emphasis in original). Under prevailing law and the facts before it, this Court must reject each of these contentions by Defendants.

At the outset, the Court rejects outright Defendants' assertion that there is not a single specific claim in Relators' Second Amended Complaint that qualifies as an FCA violation under the surgical delegation scheme. While Relators include five examples of documented instances where Fulp improperly delegated surgical tasks to Santos, Defendants argue that four out of the five procedures cited were not billed to government payors but to private worker's compensation entities, Medicare HMOs, or—in the case of one patient—to the Hidalgo County Indigent Health Care Program. However, instead of arguing that the fifth procedure was not billed to a

federal government payor, Defendants argue that this procedure did not involve any improper delegation. As to this fifth surgery, Relators provide MMC records showing that, during the total knee replacement of one patient on August 30, 2010, Santos "put in the implants in the patient and then put in the drain and closed the wound without the active participation of the surgeon (Fulp)," and that "the surgeon was in the room but not scrubbed in." (Dkt. No. 18–20, p. 2).[13] As explained above, the Court considers that claims submitted for surgeries in which Santos carried out the critical portions of knee replacements may give rise to false or fraudulent claims under the FCA, whether or not Fulp was in the room, as well as any surgeries while Santos conducted *any* surgical tasks while Fulp was in the room but not scrubbed in. Relators have provided evidence that MMC received over $15,000 for claims arising out of that particular surgery. (Dkt. No. 182–71, Attach. B).[14] Thus, despite Defendant's assertion otherwise, Relators provided a specific example of a false or fraudulent claim made by MMC in their Second Amended Complaint.

**13.** The Court notes that Relators cite testimonial evidence from Fulp and Santos in which Relators assert they both admitted that, during the August 30, 2010 procedure, Fulp was "on the phone and not scrubbed in." (Dkt. No. 182, p. 16). However, the portions of both Santos's and Fulp's depositions provided to the Court either do not include the cited information or do not make clear what date the testator is referencing. (Dkt. Nos. 182–48, 208:9–18; 182–53, 149:25–252:1). Accordingly, the Court does not consider Relator's assertions as to what this testimony conveys.

**14.** Despite Relators' assertion that Fulp billed a government payor for this procedure, (Dkt. No. 182, p. 16), the Court notes that the organization chart provided by Relators suggests that MMC, but not Fulp, received government payments for that particular surgery, (Dkt. No. 182–71, Attach. B), and Relators

have presented no other evidence that Fulp actually billed the government for that particular surgery. However, the Court does not consider this to be relevant because evidence of MMC's claim is enough to create liability for Fulp and Santos as well, because their actions were the ones which "cause[d] to be presented" the false claim under the FCA. *See* 31 U.S.C. § 3729(a)(1)(A). *See U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011) ("When the defendant in an FCA action is a non-submitting entity, the question is whether that entity knowingly caused the submission of either a false or fraudulent claim or false records or statements to get such a claim paid. The statute makes no distinction between how non-submitting and submitting entities may render the underlying claim or statements false or fraudulent.").

However, the Court considers that, even if none of the specific examples of false delegations specified in Relators' Second Amended Complaint resulted in a false claim, Relators' complaint sufficiently alleges a pattern and practice of FCA violations by Fulp, Santos and The MMC Defendants under the surgical delegation scheme. Courts have allowed FCA causes of action to proceed on the basis of a pattern and practice of fraud when the relator identifies the time period during which the false claims were submitted and provides specific examples of fraudulent billing. *See, e.g., U.S. ex rel. Tucker v. Christus Health,* No. CIV.A. 09-1819, 2012 WL 5351212, at *4 (S.D. Tex. Oct. 23, 2012) (finding that relator satisfied the requirements of Rule 9(b) based on allegations of pattern and practice when she identified by name individuals who participated in submitting false claims, described the manner in which the billing was false and/or fraudulent, specified the time period during which the false claims were submitted, and provided specific examples of each category of fraudulent billing). The fact that a realtor does not identify each false bill by date and patient name is not controlling. *Id.*

The Court further rejects Defendants' argument that the case is confined to the examples of specific claims Relators identify in their Second Amended Complaint. Under the FCA, Relators have the burden of showing that the Defendants submitted false claims by a preponderance of the evidence. To do so, Relators are not required to provide direct evidence for each and every instance of fraud. On the contrary, courts regularly find liability where—as here—relators provide circumstantial evidence that shows defendants engaged in a fraudulent scheme and submitted claims to Medicare seeking payment of such fraudulent claims. *See, e.g., U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 192 (5th Cir. 2009) (finding that

relators' showing of the underlying fraud "amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government," because "[i]t would stretch the imagination to infer the inverse," and "[t]hat fraudulent bills were presented to the Government is the logical conclusion of the particular allegations . . . even though [the complaint] does not include exact billing numbers or amounts"). Once the relator establishes FCA liability—either through circumstantial evidence alone or by concretely tying a scheme to at least one fraudulent claim—the relator can then base damage calculations on statistical "sampling and extrapolation." *United States v. Vista Hospice Care, Inc.,* No. 3:07-CV-00604-M, 2016 WL 3449833, at *12, n.100 (N.D. Tex. June 20, 2016) (citing *U.S. v. Fadul,* 2013 WL 781614, at *14 (D. Md. Feb. 28, 2013)). This method is particularly valuable where, as here, hospital records do not document the underlying fraud. *See, e.g. U.S. v. Krizek,* 192 F.3d 1024, 1030–31 (D.C. Cir. 1999) (finding, in case where physician fraudulently saw patients after more than twenty four hours, the government "need not prove which particular patient sessions occurred after the twenty-fourth hour," as the district court assumed, but to calculate the number of false claims made using reliable mathematical methodology).

In making their argument, Defendants rely heavily on the 7th Circuit's opinion in *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.* In that case, the court dismissed the relators' claims because relators failed to offer any approximation of the number of false claims, finding that "there has to be some evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of [defendant's] documents contained

false certifications." 764 F.3d 699, 714 (7th Cir. 2014).

Far from the situation in *Absher*, in which "the relators offer[ed] no evidence allowing the jury to find (even approximately) how many times" the defendant committed the underlying fraudulent act, the Court considers that Relators have presented sufficient evidence for a jury to determine how many false claims were actually presented with reasonable certainty. As discussed above, Relators have provided evidence that Fulp had a pattern and practice of allowing Santos to conduct critical aspects of orthopedic surgeries, and allowing Santos to conduct certain other surgical tasks without Fulp's direct supervision. Relator Ponce provides a sworn statement that approximately 80% of the time he observed a Fulp surgery with Santos present, Santos conducted "significant portions of the surgery." (Dkt. No. 182–77, ¶ 22). These include instances in which Ponce witnessed Fulp conduct the first two cuts of a surgery, "then leave Santos to complete the surgery." *Id.*, at ¶ 10. OR Logs show that Ponce attended 111 procedures with Fulp and Santos between January 1, 2009 and May 9, 2012. *Id.*, at ¶ 22. Based on Ponce's estimation that unlawful delegation occurred in 80% of the surgeries he witnessed, and the rate at which MMC billed a Fulp procedure to a government payor during the relevant time period, Relators provide detailed expert testimony explaining that, to a 95% confidence-interval, "the total number of surgeries billed to the Government that Mr. Santos performed for Dr. Fulp is between 922 and 978 surgeries." (Dkt. No. 182–80, ¶ 5). The Court considers that, provided this evidence, a reasonable jury could determine the number of fraudulent claims made by the government from the delegation scheme under the preponderance standard.

The Court is further unpersuaded by Defendants' assertion that testimonial evidence from Relators and other eye witnesses can never serve as Rule 406 evidence of "habit and routine practice" to give rise to FCA liability. Defendants rely on *U.S. ex rel. El–Amin v. George Washington University* for their assertion that Relators' evidence of Fulp and Santos's "pattern and practice" of improper delegation cannot support FCA liability for claims in which they did not specifically witness improper delegation. In *El–Amin*, the D.C. Circuit ruled that nurses could not testify that an illegal anesthesiology practice occurred in procedures they themselves did not witness. 533 F.Supp.2d 12, 25 (D.D.C. 2008). It ultimately rejected the proposition that the nurses' testimony was demonstrative of defendants' habit and routine practice under Rule 406 after a lengthy discussion hinging upon the Court's assessment that "the Relators' entire brief contains a paucity of facts or arguments, making it impossible for the Court to decid[e] whether particular conduct amounts to habit." *Id.* at 28–29 (internal citations omitted). That is, it was insufficiency of the nurses' testimony—not what they were trying to show—that led to the Court's ruling. *Id.* ("It seems reasonable to expect, if 'every deposed witness' will testify to the defendants' routine practice, that the Relators would have presented at least one supporting statement demonstrating the existence of a routine practice, such as the deposition testimony of an anesthesia resident, but they have not."). The Court in *El Amin* went on to reject the relators' proposed sampling method because they had failed to "define the total universe of claims that are encompassed by this lawsuit," not, as the MMC Defendants' suggest—because sampling based on eye witnesses' observations is never allowed. *Id.*, at 29 (noting that, "[b]efore the Court can determine if a given sample is adequate,

which is to say that the sample is representative of the whole, it must have some idea of the size and composition of the universe of claims," and that relators "have not been able to ascertain or enumerate the claims that are involved in this case.").

None of the issues seen as problematic to the court in *El–Amin* are present here. Without commenting on the weight of the evidence, the Court considers that, as described above, Relators have provided specific evidence of improper actions that is based on their own observations. Such evidence consists of numerous, mutually supporting statements and cannot—as a matter of law—be ruled inadmissible as Rule 406 evidence at this juncture. Finally, unlike the nurses in *El–Amin*, Relators have provided a concrete list of claims comprising the "universe of claims" involved in this case by which the Court can make a determination as to the adequacy of Relators' proposed sample size to make the witness's evidence, if admitted, reliable.

The Court therefore finds that Relators have provided reliable evidence and valid statistical methodology from which the jury could determine by a preponderance of the evidence how many of MMC's and Fulp's claims were false. Accordingly, because the Court has found that Relators have provided sufficient evidence to support their claim that MMC and Fulp submitted fraudulent claims for procedures arising out of the Surgery Delegation Scheme, the Court next addresses the Device Scheme.

## D. Device Scheme

Relators allege that, as part of the Device Scheme, Defendants violated two laws that often serve as predicates to liability under the FCA: the Stark Law and the Anti–Kickback Statute ("AKS"). In relevant part, the Stark Law bars entities from submitting claims to federal health care programs if the services forming the basis of the claims were furnished pursuant to referrals from physicians with which the entities had a financial relationship. 42 U.S.C. § 1395nn(a)(1); *Parikh*, 977 F.Supp.2d at 663. Similarly, the AKS prohibits knowingly and willfully soliciting, receiving, offering, or paying any remuneration in return for a referral or recommendation for a referral of any item or service for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a–7b(b)(1)–(2); *Parikh*, 977 F.Supp.2d at 662–63. Compliance with the AKS and Stark Law is a condition of payment for both Medicare and Medicaid, and, when a provider falsely certifies compliance with these laws when making a claim, such claim is false or fraudulent and gives rise to liability under the FCA. *U.S. ex rel. King v. Solvay S.A.*, 823 F.Supp.2d 472, 506–09.

At the outset, the Court notes that the MMC Defendants' Motion argues for dismissal of Relators' FCA and TMFPA claims under the Device Scheme on the grounds that the Amended Complaint fails to sufficiently allege when and how Fulp and Santos allegedly violated the laws, nor any facts regarding the MMC Defendants' role in the alleged kickback scheme as required by Rules 9(b) and 12(b)(6). (Dkt. No. 172, pp. 26–27). As explained above, however, the Court will review all Defendants' Motions under the standard set out in Rule 56. Furthermore, as explained in detail below, the Court is of the view that Relators have provided sufficient evidence to create a genuine factual dispute as to each element of their claim arising out of the alleged Device Scheme.

### 1. Sales Representative v. Trauma Coordinator

Central to the Parties' dispute regarding the Device Scheme—although not itself a

necessary element of the scheme—is the issue of whether Santos was a sales representative for RedMed and AOS. The RedMed Defendants argue that Santos was not a sales representative but a "trauma coordinator." They provide testimony from Jeff Hannes that sales representatives call on doctors to get them to use RedMed products, while, as a trauma coordinator, Santos "preplans for surgery," "gathers x-rays [and] films, "helps train staff," "makes sure sets are where they need to be … to fill if instruments are working," "prepares my sales rep for the surgery, [and] thinks about all the other things that my sales rep is just not ready for." (Dkt. No. 173–10, 29:19–35:6; 173:2–20). They also provide testimonial evidence from Santos that he was not involved in sales for RedMed. (Dkt. No. 173–11, 45:20–53:25). This description is corroborated by a job description sent from Hannes to himself on October 17, 2011, which describes Santos's duties as responsibilities as:

- Executive Duties (Plan strategies, goals and formulate execution agendas to ensure that objectives are met as well as ensuring that operations are conducted in accordance with these policies related to TRAUMA services).
- Operations: Plan, direct, and coordinate the TRAUMA operations of the company. These duties include formulating policies, managing daily operations, and planning the use of materials and human resources.
- Administrative Duties (Responsible for the overall technological direction organization including strategic business plans discussed and agreed upon by President on TRAUMA services)
- OTHER DUTIES: 1. Responsible for training, quality control, and day-to-day supervisory duties; as well as,

overall performance of the TRAUMA division of RMI. 2. Must attend meetings and conferences sponsored by various associations and industry organizations. (These conferences will provide an opportunity to meet with prospective customers, contractors, and manufactures and manufacture executives [sic] to keep abreast of technological and managerial innovations and new TRAUMA products).

(Dkt. No. 173–4, p. 3); *see also* (Dkt. No. 173–2, ¶ 8) (statement from Jeff Hannes replicating and explaining this description); (Dkt. No. 173–3) (undated employment agreement between RedMed and Santos replicating this description).

The Court notes, however, that the only evidence provided by Defendants that Santos was a trauma coordinator and not a sales representative comes in the form of self-serving testimony from Hannes and Santos themselves and from Hannes's email to himself in late 2011 of Santos's job description. Meanwhile, Relators provide evidence that the testimony and job description provided by Defendants is nothing more than a sham attempt to cover up Santos's true role as a sales representative. For example, Relators provide evidence that Hannes held Santos out as a sales representative to device manufacturers and other suppliers. Organizational charts sent by RedMed to device manufacturers listed Santos on a list of "Sales Representative and Associates," (Dkt. No. 182–41, p. 3) and in an e-mail attachment sent to a representative of medical supplier Covidien Biosurgery in October 2012, Hannes included Santos in a list of "Sales Representatives" for RedMed. (Dkt. No. 182–61). In his deposition, Jeff Hannes stated that, in documents communicating with Stryker, he conveyed that RedMed "does not have any other employees that sell for RedMed and are employed by hos-

pitals in the area" beside Alex Santos and one other individual. (Dkt. No. 182–26, 163:5–162:22).[15]

Relators also provide evidence that MMC staff widely believed Santos to be a sales representative. This evidence includes investigative notes from MMC Candi Constantine from March 2012, which state that "Alex [Santos] is a rep and uses his own products." (Dkt. No. 182–8, p. 4). Investigative notes from MMC corporate representative Patricia McClelland state that Mario Garza, OR Director for MMC, "reported that Mr. Santos went to PRN status earlier in the year so he could take a full-time sale representative position." (Dkt. No. 182–13, p. 3). In her deposition, Ms. McClelland stated that she believed MMC thought that Santos was a sales representative for RedMed. (Dkt. No. 182–31, 105:2–8). One MMC employee testified that "there had been word that [Santos] was a sales rep and that he was an employee of Fulp" while also being an employee at the hospital. (Dkt. No. 182–54, 94:11–14).

Relators provide evidence that Santos held himself out to be a sales representative. In an application for credentialing as a Health Care Industry Representative filed out February 22, 2011, Santos wrote in his employment history that he served as a "Sales Representative" for "RedMed, Inc." from "Jan 2011 to present." (Dkt. No. 182–64).

Finally, and perhaps most persuasively, Relators provide evidence that Santos indicated to device manufacturers that he could convince Fulp and other doctors to use their products, a duty that is a hallmark of a sales representative. In an October 29, 2011, e-mail to a device manufacturer about a "solution" for a particular device—on which Hannes was copied—Santos indicated that he would "Show Fulp as early as the weekend." (Dkt. No. 182–62). In another email from a device manufacturer representative, dated April 25, 2012 and including Hannes, the manufacturer thanked Santos "for trying to get us business especially the rod with Fulp this past Monday," and that, in reference to another company indicating that they can "get Fulp's rod business," "[a]nything [Santos] can do there will help." (Dkt. No. 182–63). These e-mails indicate that device manufacturers understood Santos's role to be to encourage doctors—specifically Fulp—to use their devices over the devices of other companies. Viewed in the light most favorable to the Relators, it supports a conclusion that—despite Santos's job description—he served at least in part as a sales representative.

Further evidence suggests that Hannes avoided calling Santos a sales representative and changed Santos's title and job description to that of a trauma coordinator in order to cover up the Device Scheme. In his deposition, Hannes stated that "[b]ased on the perception and reading the complaints, I know that Alex Santos cannot be a scrub technician[....] and be in sales." (Dkt. No. 182–26, 45:4–6). The Court notes that the job descriptions provided by the RedMed Defendants allegedly signifying that Santos was a trauma coordinator were drafted at the earliest on August 24, 2011, long after Santos began working with Red-Med. (Dkt. Nos. 173–3; 173–4, p.3). This evidence, viewed alongside evidence that Santos carried out the duties of a sales representative, reasonably supports an inference that Hannes employed Santos as trauma coordinator in name only, post fac-

15. The Court notes that Hannes also stated during his deposition that neither of these communications with device manufacturers were "completely" accurate with regard to Santos's role, but nonetheless considers that this inconsistency undermines his position that Santos was not engaged in sales. *See* (Dkt. No. 182–26, 61:3–11; 164:13–21).

to creating that job description so as to cover up the fact that Santos was actually working as a sales representative.

Relators have presented evidence that Santos and Hannes both held Santos out as a sales representative for RedMed to MMC and its employees, to device manufacturers, and to their competitors for at least a portion of the period covered in the Second Amended Complaint. More significantly, Relators provide evidence that Santos, as part of his working with RedMed and AOS, made recommendations to Fulp about which medical devices to use. Viewing all of this evidence as a whole, the Court considers that the evidence reasonably supports the conclusion that labelling Santos as a "trauma coordinator" was merely a cover-up for Santos's true roll as a sales representative, which Hannes knew would be viewed as inappropriate. Such a conclusion, while not determinative, supports Relators' assertion that Santos's relationship with the RedMed Defendants was improper and that Hannes knew as much.

## 2. Stark Law Violation

Relators allege that the Device Scheme violated the Stark law, which prohibits physicians from referring patients to an entity for certain "designated health services" if the referring physician has a non-exempt "financial relationship" with such entity. See 42 U.S.C. § 1395nn. Therefore, to demonstrate a Stark law violation, Relators must show that Fulp had a "financial relationship" with an entity that provides "designated health services"—here, Red-

Med—and that he made a "referral" to the entity for which payment could have otherwise been made by a government healthcare program. Id. The Stark law includes in its definition of a "financial relationship" a "compensation arrangement," which is in turn defined as "any arrangement involving any remuneration" between the physician and the entity. Id., at §§ 1395nn(a)(2); 1395nn(h)(1)(A). The Stark Law defines "remuneration" as any kind of payment "directly or indirectly, overtly or covertly, in cash or in kind." Id., at § 1395nn(h)(1)(B).

All of the Defendants argue that Relators have not provided evidence of a Stark Law violation because there is no evidence of a "financial relationship" between Fulp and the RedMed Defendants.[16] They provide evidence—in the form of sworn statements from Hannes, Santos, and Fulp—that Santos was compensated by either MMC or Fulp, not by any of the RedMed Defendants, when he was acting as Fulp's scrub tech, that Santos was never "loaned" to Fulp by any of the RedMed Defendants, and that no other "financial relationship" exists between Fulp and the RedMed Defendants except for in their capacity as a device distributor. (Dkt. Nos. 137–2, ¶¶ 17–21; 127–13, ¶¶5–6; 137–14, ¶¶ 30–34).

Relators do not contend that the RedMed Defendants made any cash payments to Fulp. Instead, they contend that Fulp received remuneration from RedMed in the form of Santos's services. Defendants do not argue that such a provision of personnel does not constitute "remuneration"

---

16. The Court notes that Defendants also argue that Santos cannot be held liable under the Stark Law because he is not a physician. See (Dkt. No. 172, p. 40; Dkt. No. 173, p.3, n. 5). However, Relators have clarified that they "did not allege that Fulp received cash payments from RedMed[, but] that Fulp received remuneration from RedMed in the form of Santos's services because RedMed provided

Santos as personnel for Fulp." (Dkt. No. 182, p. 54). Accordingly, the Court will not address any arguments regarding the theory of Stark Law liability arising out of payments between the RedMed Defendants and Santos, and considers only Relators' theory that Santos's services were provided by the RedMed Defendants as payments in kind.

under the Stark Law but, rather, that Relators have not provided any evidence of RedMed "lending" Santos to Fulp. The Court observes that there is scant case law on this particular theory of "remuneration in kind," and the Parties cite no case law directly addressing remuneration in the form of lending the services of a paid employee or contractor to another. *But see, e.g. U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 96 (3rd Cir. 2009) (finding that benefits received by a group of anesthesiologists via an exclusive service arrangement with hospital in which group provided all anesthesia and management services and received office space, medical equipment, and personnel, constituted "remuneration in kind" from hospital to the group in violation of the Stark Law); *see also U.S. ex rel. Fry v. Health All. of Greater Cincinnati*, No. 1:03-CV-00167, 2009 WL 485501, at *4 (S.D. Ohio Feb. 26, 2009) (finding no substantial ground for difference of opinion that allowing cardiologists additional time with a hospital's heart station in proportion to the volume of procedure referrals the cardiologists made to the hospital amounted to remuneration in kind under the AKS).

In support of their claim, Relators point to an MMC Operating Room Log dated June 11, 2012, which shows that Santos served as a private scrub technician for Fulp during a procedure. (Dkt. No. 182–75). A RedMed invoice from the same procedure shows that $4,765.00 in RedMed products were used during that procedure, and the RedMed Defendants concede that Santos was being paid by AOS exclusively in the form of commission payments for such devices at the time the procedure occurred. (Dkt. Nos. 182–76; Dkt. No. 173, p. 12). Relators argue that, making all inferences in their favor, this evidence provides a basis for a reasonable jury to find "that RedMed provided Santos as personnel to Fulp—specifically as a private scrub technician in certain procedures—in violation of the Stark law." (Dkt. No. 182, p. 55).

Defendants, for their part, provide evidence that Santos was also paid by MMC for his role as a scrub technician in the June 11, 2012 surgery, which they argue makes "clear, then, that Santos was working for MMC and was not provided by RedMed to Fulp." (Dkt. No. 190, p. 15; Dkt. No. 97). The Court does not find this evidence as persuasive as Defendants contend. First, the fact that MMC paid Santos for the hours in which he served as a "private scrub tech" for Fulp does not necessarily preclude a finding that his services amounted to remuneration under the Stark Law. The question of concern for the Court is whether the RedMed Defendants lent Santos's services in some way to Fulp in exchange for referrals. Whether MMC also paid Santos for his services at the same time, while relevant, is not controlling; more persuasive would be, for example, evidence regarding whether Fulp paid Santos for his services as a "private scrub tech" during that surgery. But such evidence is not before the Court. What the evidence does show is that, at least during the June 11, 2012 surgery, Santos served as a "private scrub tech" for Fulp while another person took on the role of scrub technician for MMC. (Dkt. No. 182–75).[17]

---

17. Defendants argue that this label is just a "stray clerical error." (Dkt. No. 186, p. 27). However, other evidence makes clear that Santos was employed by Fulp in some capacity as a scrub technician outside of his employment with MMC. *See, e.g.* (Dkt. No. 172–1, 252:10–20; 335:5–23). Furthermore, viewing the evidence in the light most favorable to the Relators, the Court cannot assume that the label was in error, and thus considers Santos's being labeled as a private scrub technicians an intentional indication that Santos served as Fulp's personal scrub technician during the surgery as opposed to the scrub technician provided by MMC.

It is undisputed that the RedMed Defendants paid Santos on a commission basis for the devices used during that same surgery. The Court considers that this evidence would allow a reasonable jury to conclude that, while Santos was providing services to Fulp in the form of his time, skills, and expertise as a scrub tech, he was being remunerated by the RedMed Defendants for doing so. The Court is cognizant of Relators' observation that a direct cash payment to Fulp by RedMed as a reward for utilizing RedMed products would be unlikely by sophisticated parties seeking to avoid getting caught violating the Stark Law. Instead, the evidence suggests that the parties sought to accomplish the same remuneration to Fulp by having RedMed assume payments to Fulp's private scrub technician and thereby obviating Fulp's need to remunerate his scrub technician. The economic benefit to Fulp was the same as if RedMed had made cash payments directly to Fulp. The Court considers that, as a matter of law, if proven, such provision of Santos's scrub technician services to Fulp amounts to "remuneration in kind" so as to create a prohibited financial relationship under the Stark Law.

### 3. AKS Violation

Relators allege that Defendants' Device Scheme violated the AKS because the RedMed Defendants paid Santos commission on devices used in Fulp's scheduled surgeries at MMC and other hospitals, and that this relationship was arranged with the intent to induce Santos and Fulp to order RedMed's products. To prove an AKS violation, Relators must show that Defendants knowingly and willfully solicited, offered, paid, or received "remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" that is intended to induce a referral for an item or service for which payment can be made from a Federal healthcare program. 42 U.S.C. § 1320a–7b(b). The Court addresses the remuneration and intent elements separately.

### a. Remuneration

■ With respect to whether remuneration prohibited by the AKS occurred, the MMC Defendants argue that Relators have only asserted an "ill-defined" financial relationship between Fulp and Santos, without showing any details about improper payments, incentives, and services provided by Santos or RedMed to Fulp. (Dkt. No. 172, pp. 28–29). The Court disagrees.

Defendants argue that Santos's dual role as scrub technician for Fulp and representative for RedMed and AOS was proper. They provide testimonial evidence from Fulp that he never received any remuneration directly from RedMed, and that he paid Santos for his services as a scrub technician. (Dkt. No. 172–1, p. 50, 252:2–20).[18] They also provide testimonial evidence from Jeff Hannes that "[w]hen Alex is my employee, working for me, he does what I instruct him to do. So during a particular surgery, and he is scrubbed in, he is not my sales rep." Id., p. 55, 197:21–24. The RedMed Defendants also provide affidavits from Hannes, Fulp, and Santos that neither Hannes, RedMed, nor AOS ever exchanged any compensation with Fulp, nor "loaned" Santos to Fulp as personnel for Santos's services as either a surgical tech or Certified First Assistant. (Dkt. No. 173–2, ¶¶ 17–21; Dkt. No. 173–13; Dkt. No. 173–14, ¶¶ 30–34).

While it is argued by Defendants that, because Santos strictly separated his rolls

---

**18.** Santos worked at MMC on Mondays and Fridays, and with Fulp at other hospitals on Tuesdays and Thursdays. *Id.,* p. 52, 336:6–22.

as scrub technician for Fulp and representative for RedMed, there was no AKS violation, the Court considers that this set-up itself may give rise to AKS liability. It is undisputed by both parties that RedMed and AOS—both solely owned by Hannes—made cash payments to Santos. Relators provide evidence that, from 2011 through April 2012, Santos was paid $225,000 by RedMed, and between May 2012 to December 2012, he was paid more than $294,000 by AOS. (Dkt. No. 182–26, 132:18–22; Dkt. No. 182–56). At least a portion of this money—if not all of it—was earned as commission for selling RedMed trauma products; it is undisputed that Santos received a sales commission for each trauma product used by Fulp. (Dkt. Nos. 173–11, 46:2–10, 64:5–65:21; Dkt. No. 182–26, 118:18–23). That is, Mr. Santos received a commission from RedMed for the sale of devices that were used during procedures which Santos himself assisted on. Considering this alongside the evidence discussed above that Santos performed all or substantially all of many of Fulp's procedures and that he helped convince Fulp to use RedMed devices in his surgeries, these payments themselves may amount to "remuneration" under the AKS. Because it has been established that such remuneration was made, the Court focuses on whether Relators have provided evidence that one purpose of the remuneration was to induce referrals.

### b. Intent to Induce Referrals

 "[A] person who offers or pays remuneration to another person violates the [AKS] so long as one purpose of the offer or payment is to induce ... patient referrals." *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000) (citing *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998)). It is not necessary to show that inducing referrals was the primary purpose of the remuneration. *Id.* Here, evidence presented by Relators sup-

ports their allegation that, in arranging and perpetuating a scheme in which Santos was hired and paid by the RedMed Defendants, the RedMed Defendants, Santos, and Fulp all intended the scheme to increase the amount of referrals the RedMed Defendants received from Fulp.

Relators provide evidence that the RedMed Defendants hired Santos with the explicit purpose of increasing the amount of referrals RedMed received from Fulp. When Santos was hired by RedMed, he was already known to be Fulp's employee. *See* (Dkt. No. 182–53, 252:6–253:13). Neither Hannes nor his companies sold trauma products to Fulp before Santos came on as a trauma coordinator, and, once Santos began working for RedMed, Fulp became one of RedMed's primary trauma product customers. (*Id.*; Dkt. No. 182–26, 112:21–24).

Relators further provide evidence that, in working for RedMed in addition to his job as a scrub technician, Santos intended his arrangement to create business for RedMed in the form of increased referrals for their products. Relators provide evidence that in 2011, before committing to working for RedMed, Santos approached Relator Adan Ponce—a sales representative for Smith & Nephew, one of RedMed's competitors—and proposed that they "work together," stating that Ponce could increase Smith & Nephew's business at MMC because of Santos's position at the hospital. (Dkt. No. 182–77, ¶ 19). When Ponce declined, Santos proposed that Smith & Nephew pay Santos's brother for a "no show" job in order to increase Smith & Nephew's business at MMC. *Id.* When Ponce declined again, Santos said that Smith & Nephew would "lose business tomorrow" if they did not hire him. *Id.* This evidence supports Relators' position that Santos intentionally and overtly sought to use his position with Fulp and MMC as

leverage to acquire a position with a device distributor, specifically by the promise of increasing distributors' business with Fulp and MMC. It allows a reasonable inference that Santos intended the commission payments he received from RedMed and AOS as inducements to encourage Fulp's (and his own) use of RedMed products.

Furthermore, the Relators also provide evidence supporting their position that Fulp also intended their arrangement to increase his referrals to RedMed. Relator Adan Ponce provided testimony that Fulp told Ponce that Ponce was forcing him to use RedMed's inferior products because RedMed, not Smith & Nephew, had hired Santos. *Id.*, ¶ 20. This statement, taken as true, provides strong evidence that Fulp understood that, by hiring Santos as a representative, a medical supply company—in this case RedMed—would get more of his business.

In addition to the affidavit provided by one of the Relators, there is corroborating evidence that MMC employees recognized the arrangement between Santos, Fulp, and the RedMed Defendants to be improperly aimed at increasing Fulp's use of Red-Med products. Relators provide internal MMC documents showing that someone complained that Santos was "offer[ed] his first assistant skills in exchange for doctors using the product he sells." (Dkt. No. 182–58, p. 2).[19] Further evidence shows that a nurse complained to MMC risk management staff about Santos being a surgical assistant and device representative who "uses [his] own products" in surgeries. (Dkt. No. 182–8, p. 4). All of this evidence supports Relators' assertion that Santos's position with RedMed was intended to increase RedMed's referrals at the hospital, and that MMC knew as much.

Defendants provide deposition testimony from both Fulp and Santos that Santos did not decide whether to utilize RedMed's products in surgeries; that these decisions were made by Fulp. (Dkt. Nos. 173–11, 81:5–10; 173–12, 246:24–247:19). The Red-Med Defendants argue that, because Santos did not make decisions about which products to use, the payments made to Santos by RedMed could not have been intended to induce referrals. According to Defendants, the fact "[t]hat Santos and Fulp sometimes worked together is not enough: [t]o plead their case with particularity, Relators must identify unlawful referrals by Santos, and they have not done so." (Dkt. No. 172–1) (citing *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 Fed.Appx. 890, 894 (5th Cir. 2013); *U.S. ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F.Supp.3d 793, 807 (N.D. Ill. 2015)). The Court considers this to be an incorrect assessment of the law. While it is true that *Nunnally* stands for the proposition that "actual inducement is an element of the AKS violation," as the court explained in *Parikh*, this interpretation is at odds with the statute and the outcome in *Nunnally* itself:

> This issue turns on the interplay between the FCA and the AKS. On its own, the AKS does not require actual inducement. The statute makes it unlawful to pay kickbacks "to any person to induce such person ... to refer an individual" for reimbursable services. 42 U.S.C. § 1320a–7b(b)(2)(A). The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results. Case law thus consistently treats the AKS's inducement element as an intent

19. The report also states that the anonymous caller alleged that, during the week of June 12, 2011, hospital paperwork listed Santos as working as a sales representative and a first assistant at the same surgery, but that the paperwork was later changed. (Dkt. No. 182–53, p. 2).

requirement. See, e.g., United States v. Davis, 132 F.3d 1092, 1094 (5th Cir. 1998); United States v. McClatchey, 217 F.3d 823, 834–35 (10th Cir.2000) (both treating the inducement requirement as an intent element in rejecting the position that a defendant's sole motivation in making payments must be to induce referrals). Nunnally's statement that "actual inducement is an element of the AKS violation," see Nunnally, 519 Fed.Appx. at 894–95, thus appears at odds with both the language of the AKS and precedent applying that statute. It also turns out to be at odds with Nunnally itself. In the very next line after the statement Defendants quote, the Fifth Circuit stated that pleading "reliable indicia" of actual inducement required alleging only "that [the defendant] knowingly paid remuneration to specific physicians in exchange for referrals"—the commonly accepted understanding of the AKS's inducement requirement. Id. In any event, as an unpublished opinion, Nunnally does not bind this Court.

Parikh, 977 F.Supp.2d at 664–65. Because the Court agrees with the finding in Parikh that neither a plain reading of the AKS nor Nunnally itself demonstrates a requirement that Relators show any actual referrals to RedMed products made by Fulp or Santos, it is not persuaded by Defendants' argument. The statute only requires that Relators provide evidence that one purpose of the remuneration was to induce the person receiving the kickback to make a referral, which, as explained above, the Court considers Relators have done with some legally sufficient evidence.

Defendants' assertion that Relators must show that Santos—as opposed to Fulp—made the decision to use RedMed products is not supported by the statute itself. The AKS doesn't only prohibit soliciting or offering remuneration in return for referrals; it also prohibits soliciting or offering remuneration in return for "arranging for the furnishing of" and "recommending purchasing" such an item or services. 42 U.S.C. § 1320a–7b(b)(1)–(2). While Defendants provide testimony from Fulp that he—not Santos—made decisions regarding which devices to use, they also provide evidence that RedMed sales representatives call on doctors, "showing them the nuances, why [RedMed's product] works as well as what they're using, if not better." (Dkt. Nos. 172–1, p. 48, 247:7–284:6; 173–10, 35:12–20). In other words, RedMed sales representatives recommend that doctors use RedMed products and arrange for the furnishing of those products in doctors' surgeries. See 42 U.S.C. § 1320a–7b(b). Relators have provided evidence, discussed above, that Santos actually performed the role of a sales representative—not trauma coordinator—for RedMed, and that he made recommendations to Fulp about which devices to use. See, e.g., (Dkt. Nos. 182–62; 182–63). The Relators have provided evidence that suggests that Santos recommended to Fulp that he use RedMed products in his surgeries and/or arranged for the furnishing of RedMed products in violation of the AKS.

Finally, Relators have provided evidence that Fulp and Santos's relationship actually resulted in an increase in referrals to RedMed products. Relators provide evidence that "MMC purchased at least 2,053 devices from RedMed between January 1, 2009 and December 31, 2015" and that "[a] government payor was billed for these devices in 146 procedures." (Dkt. No. 182–71, ¶ 19). Although Relators do not provide evidence of the amount of RedMed products used by Fulp prior to Santos's relationship with the RedMed Defendants began, they do provide evidence that, after Santos began working with RedMed, Fulp accounted for a majority of their trauma

product sales. *See, e.g.* (Dkt. No. 182–26, 112:21–24). Viewed in the light most favorable to the Relators, this evidence supports a reasonable inference that the arrangement did in fact result in additional referrals.

All of this evidence, viewed in the light most favorable to the Relators, creates a genuine dispute as to whether the Device Scheme violated the AKS and the Stark Law. The Court notes that Relators present evidence allowing them to survive summary judgment on three different theories of liability under the Device Scheme. First, they present evidence that Fulp violated the Stark law by referring his patients to RedMed products despite the remuneration in kind he received from RedMed in the form of Santos's services. Second, they present evidence that, in violation of the AKS, RedMed paid Santos remuneration in the form of paychecks and commissions on the very products that Santos helped Fulp install, and that such payments were intended to induce Santos to recommend that Fulp use RedMed products and/or to furnish RedMed products to Fulp. Finally, Relators have provided sufficient evidence that Fulp was provided remuneration in kind by the RedMed Defendants, in the form Santos's services, and that such remuneration was intended to induce referrals to RedMed products by Fulp. Because the Court considers that Relators have presented sufficient evidence to survive Defendant's motion for summary judgment as to their Stark Law and AKS claims, it moves on to address Defendants' affirmative defense that they cannot be held liable for an AKS violation because Santos was a bona fide employee of RedMed.

#### c. Bona fide employee affirmative defense

■ Defendants assert that they are entitled to summary judgment because, at all relevant times, Santos was a bona fide employee of either RedMed or AOS, and

therefore fell under the AKS's employee safe harbor provision. Relators respond that they present sufficient evidence to create a factual dispute as to whether Santos qualifies as a bona fide employee for the purposes of the AKS. (Dkt. No. 182). Without reaching the larger issue of whether this defense is applicable to the various kickback schemes alleged by Relators, the Court finds that Relators have satisfied their evidentiary burden to create a material issue of fact on this point.

■ The AKS explicitly states that it does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items and services." 42 U.S.C. § 1320a–7b(3)(B). This so-called "bona fide employee safe harbor" is also codified in 24 C.F.R. § 1001.952(i), which provides that "any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs" does not amount to a "remuneration" for the purposes of the statute. 42 C.F.R. § 1001.952(i). The AKS employment exemption is an affirmative defense on which Defendants have the burden of proof. *Parikh*, 977 F.Supp.2d at 668 (citing *United States v. Robinson*, 505 Fed.Appx. 385, 387 (5th Cir. 2013) (per curiam) (citations omitted)).

■ Relators have provided sufficient evidence to demonstrate a genuine factual dispute as to whether Santos was a bona fide employee of RedMed and AOS. The AKS's employment exemption only excepts compensation paid to bona fide employees, who are defined as any "individual who, under the usual common law rules applicable in determining the employer-employee

relationship, has the status of an employee." 26. U.S.C. § 3121(d)(2); *see also* 42 C.F.R. § 1001.952 ("For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2)."); *Robinson*, 505 Fed.Appx. at 387. Because this statute refers to the common law definition of employee, it incorporates the general common law of agency. *Robinson*, 505 Fed. Appx. at 387 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)). The ultimate determination of employment status is a question of law based on underlying findings of fact. *Trahan v. Honghua Am., LLC*, No. CIV.A. H-11-2271, 2013 WL 2617894, at *4 (S.D. Tex. June 10, 2013) (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1225–26 (5th Cir. 1990)). When the facts that bear on the employee status factors are disputed, summary judgment is not appropriate. *Id.* (citing *Tran v. Thai*, No. CIV.A. H-08-3650, 2010 WL 5232944, at *5 (S.D. Tex. Dec. 16, 2010) (citations omitted)).

▮▮▮▮. The common law of agency focuses on the hiring party's "right to control the manner and means" of the work performed in determining whether there is employee status. *Darden*, 503 U.S. at 323, 112 S.Ct. 1344. There is "no shorthand formula or magic phrase that can be applied" to determine whether a person is an employee, and therefore "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *N. L. R. B. v. United Ins. Co. of Am.*, 390 U.S. 254, 258, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). In determining whether there is employee status, courts focus on a number of nonexhaustive criteria, which includes:

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24, 112 S.Ct. 1344 (quoting *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (footnotes omitted); Restatement (Second) of Agency § 220(2) (1958) (listing nonexhaustive criteria for identifying master-servant relationship); Rev. Rul. 87–41, 1987–1 Cum.Bull. 296, 298–99 (setting forth 20 factors as guides in determining whether an individual qualifies as a common-law "employee" in various tax law contexts).

The RedMed Defendants argue that Santos was a bona fide employee of RedMed and later AOS based on a number of factors from the common law of agency. In addition to the factors listed above, they cite the degree of an employer's control over the order and sequence of the work, whether oral or written reports were required, and the payment of business and/or travel expenses as additional factors considered by courts in making the determination. (Dkt. No. 173, p. 8) (citing *United States v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-1002-ORL-31, 2014 WL 68603, at *5 (M.D. Fla. Jan. 8, 2014) (listing these factors as relevant in determining that doctors were bona fide employees under the AKS) (internal citations omitted). The Court will address each of the factors on which the Court has been provided some evidence.

### i. The extent of Hannes's control over Santos's duties

In support of their assertion that Santos is a bona fide employee, the RedMed Defendants argue that Hannes controlled the "manner and means" of the work performed by Santos, including by assigning him additional tasks, and that Santos was required to report back to Hannes regarding his work and to follow Hannes's instructions on specific tasks. *Id.* at p. 9. They provide an affidavit from Jeff Hannes stating that he had the authority, on behalf of RedMed, "to instruct Santos as to when, where, and how [his] duties were to be performed and the ultimate results to be achieved," to dictate "what projects were higher priority and by when they needed to be completed," and to require reports from Santos "regarding his work, including information regarding inventory, products needed, and training of RedMed's sales representatives." (Dkt. No. 173–2, ¶ 10). The RedMed Defendants also provide several copies of e-mails exchanged between Hannes and Santos between May 2011 and August 2014, which include detailed instructions for Santos to complete various inventories of products within a specific time frame and to interview potential employees. (Dkt. No. 173–4).

Relators, for their part, provide evidence that Hannes did not have as much control over Santos's duties or his schedule as Defendants suggest. They point out that, despite Hannes's testimonial assertions that Santos worked under his direction, control, and supervision, Defendants have not provided any evidence that RedMed had concrete "standards of performance, policies, rules and regulations" supposedly set by RedMed for the position. (Dkt. No. 182, p. 46). They also point to testimony provided by Hannes indicating that, in practice, he exercised no control over or even had knowledge of Santos's schedule. Hannes testified that, while "he could always reach" Santos, he did not monitor how he used his time, stating that "as long as his job duties and requirements were being met, I didn't have a set schedule." (Dkt. No. 182–26, 240:1–241:24). Hannes also stated that Santos would submit his own reports for payment, and that he did not monitor how much Santos was being paid, stating that he would "pretty much approve everything without really ever looking at them." *Id.*, at 112:1–5.[20]

As further evidence that Hannes did not control the manner and means of Santos's work, Relators point to evidence indicating that Santos had far too many employers and too irregular a schedule for Hannes to control Santos's schedule. Hannes testified that he was aware that Santos worked for as many as six other employers, including MMC, Fulp, Rio Grande Regional Hospital, Valley Regional Hospital, Valley Baptist Brownville, and a company called SterilMed. *Id.*, at 172:9–19, 241:25–242:15. Santos further indicated that he was also employed by Accion Rehab, an entity owned by Hannes, and Anne Marie Hannes, Hannes's wife, during the same period, as well as an entity called South Texas Omni Medical Products. (Dkt. No. 182–48, 198:4–199:23). Despite all of these employers competing for his time, Santos's time records with MMC appear to show that he worked over 1,300 hours for the hospital in that year, and MMC's corporate representative testified that MMC expects their employees to prioritize it before other employers, stating that "our job should be primary." (Dkt. Nos. 182–31, 118:21–119:2; 182–42). In addition, Fulp testified that he was "sure [Santos]

---

**20.** The Court notes that this appears to conflict with Santos's testimony that he did not determine at what percentage rate his commission payments were made, because that determination was made by Hannes. (Dkt. No. 182–48, 72:1–23).

worked more than 40 hours a week with me." (Dkt. No. 182–53, 98:17–18).

Viewing all of this evidence in the light most favorable to the Relators, the Court considers that Defendants have provided inconsistent and conflicting testimony regarding the degree of control that Hannes exercised over Santos. Meanwhile, Relators have demonstrated factual disputes as to whether Hannes was aware of and controlled Santos's schedule, including when exactly he completed certain tasks. The Court considers that, as a whole, the evidence is consistent with a characterization that Hannes only generally dictated the outcome of Santos's work, not the "manner and means" with which he achieved those outcomes. Accordingly, Defendants have not demonstrated that this critical factor weighs in favor of finding that Santos was a bona fide employee of any of the RedMed Defendants.

### ii. Skills and training

The RedMed Defendants argue that the skills and training Santos needed to perform his job were supplied by them. They provide an affidavit from Hannes that, while Santos had knowledge "regarding trauma applications, trauma instruments, and fracture management prior to being hired by RedMed and AOS," he received training in relation to the products manufactured by the lines carried by RedMed "through training sessions and distribution of training materials received by those manufacturers." (Dkt. No. 173–2, ¶ 12). They also provided two e-mails, dated May 24, 2011 and March 14, 2012, indicating that Santos attended a training session and was sent a brochure on surgical techniques, both provided by Aesculap, a surgical product manufacturer. (Dkt. No. 173–4, pp. 2, 5–6).

Meanwhile, Relators point to testimony from Hannes and others that they argue indicate that Santos already had the skills needed to perform his duties—that, in fact, he was hired for those pre-existing skills and the union those skills gave him to Fulp. Hannes testified that he hired Santos in 2007 for his experience in "trauma applications, trauma instruments, fracture, [and] management," and that prior to hiring Santos, RedMed "didn't really know what [they] were doing" because, according to Hannes, trauma "wasn't [his] forte . . . [i]t wasn't [Hannes'] training." (Dkt. No. 182–26, 18:11–16; 38:7–16). This was corroborated by the testimony of Fulp, who stated that "Hannes had no experience in the trauma world," (Dkt. No. 182–53, 253:1–5), and by Santos, who stated that Hannes's other employee "knew nothing about trauma," and that his role as trauma coordinator with respect to other RedMed representatives was to "educate, educate, educate." (Dkt. No. 182–48, 154:1–4). Furthermore, Relators argue that the evidence submitted by the RedMed Defendants suggesting that Santos was provided on-the-job training regarding products sold by RedMed and AOS does not support their assertion that RedMed provided training to Santos, both Hannes's affidavit and the supporting e-mails establish that the training was provided by device manufacturers, not by the RedMed Defendants. *See* (Dkt. Nos. 173–2, ¶ 12; 173–4, pp. 2, 5–6).

Viewing the evidence presented in the light most favorable to the Relators, the Court considers that there are genuine factual disputes regarding whether RedMed furnished to Santos the skills and training he needed to complete his duties. Relators have provided more than sufficient evidence to allow a reasonable inference that Santos was hired because of his pre-existing, specialized skills and experience and that, while he may have needed specific training on individual medical devices, such training was provided by device manufacturers, not by the RedMed Defendants. Accordingly, the Court considers

that the RedMed Defendants have not established that this factor weighs in their favor in determining whether Santos was a bona fide employee under the AKS.

### iii. Tools and instrumentalities

The RedMed Defendants also argue that the tools and instrumentalities Santos needed to complete his job were supplied by the RedMed Defendants and, for the most part, located at the RedMed office. Jeff Hannes's statement also indicates that Santos was provided an iPad to use in his duties, and that the products and instruments Santos was charged with inventorying were mostly located at the RedMed Defendants' offices, although some are located at the hospitals with which they do business. (Dkt. No. 173–2, ¶¶ 7, 8) Similarly, Santos's deposition testimony includes a statement that all of the equipment he used was "supplied by RedMed." (Dkt. No. 173–11, 257:13).[21] Relators do not provide contradictory evidence, and the Court considers that this factor weighs in favor of Defendants' assertion that Santos was a bona fide employee of RedMed.

### iv. Duration of employment and employment agreement

The RedMed Defendants argue that Santos has been employed by RedMed or AOS for at least five years and that the term of employment was in writing and indefinite. Such a finding tends to weigh in favor of finding that a person is an employee. *See* Restatement (Second) Agency § 220 at cmt j. Hannes's affidavit states that "in early 2011 through April 30, 2012, [Santos] was my employee through Red-

Med as a Trauma Coordinator," and that, on May 1, 2012, AOS and Santos entered in to a full-time employment agreement. (Dkt. No. 173–2, ¶¶ 5, 6). The Court notes that the employment agreement provided between RedMed and Santos is undated and unsigned; its metadata indicates that it was created on August 24, 2011, suggesting that Santos worked for Hannes for a time without any written employment agreement. *See id.* at ¶ 5; (Dkt. No. 173–3). Hannes sent himself an e-mail with the terms of the employment agreement written out on October 17, 2011. (Dkt. No. 173–4, p. 3). The employment agreement between Santos and AOS, identical to the agreement with RedMed, is signed and hand-dated May 1, 2012. (Dkt. No. 173–5). Neither employment agreement has a fixed term, renewing automatically each year unless terminated. *Id.* at ¶ 4; (Dkt. No. 173–3, ¶ 4).

Relators point out several inconsistencies in Hannes's testimony which they argue cast doubt on his assertion that his and Santos's relationship was governed by an employment agreement for much of the time he was employed by the RedMed Defendants. They point to discrepancies in Hannes's testimony in which he first stated that the document purported to be an employment agreement was merely an "embodiment" of the terms between Red-Med and Santos, and later, after admitted coaching by his attorney, testified that "after talking to counsel, this is definitely the agreement that I gave to Alex Santos." (Dkt. No. 182–26, 74:11–25; 78:1–10).

---

**21.** In support of their assertion that RedMed supplied the "tools and instrumentalities" necessary for Santos to carry out his duties, the RedMed Defendants also assert that they provided the actual products that Santos was charged with inventorying, stating that "to complete the inventory work, Santos must go to the office, conduct an inventory of the products, notify Hannes regarding what needs to be ordered, and notify Hannes regarding

what needs to be sent back to the distributers." (Dkt. No. 173, p. 18). The Court does not find this argument persuasive, however, since it is not logical to consider the products being inventoried as "tools and instrumentalities" of the task of inventorying, but the object of the task. A house inspector could not, after all, consider the house which he inspects to be a tool or instrumentality of his inspection.

Hannes was also unable to produce a signed copy of the employment agreement, and stated that he could not remember what year it was in fact signed "without a reasonable doubt." *Id.*, at 84:3–24. The Court also notes that neither the RedMed nor the AOS agreement includes details about how Santos would be paid, and Hannes testified that he and Santos agreed that "if a trauma implant was used from my company with any trauma surgeon in the Valley, or in my territory, he got paid a percentage commission." *Id.*, at 90:6–12. Hannes also stated that he did not remember the terms of that agreement, and that although he "may have given [Santos] a draft of something official," he could not recall if or when he did so. *Id.*, at 90:13–24. Finally, it is unclear to the Court from the evidence provided when Santos began working for RedMed; Hannes's testimony provides that he hired Alex Santos in 2007, but that he did not recall what Santos did for him at that time, stating that "he helped organize some things in the office for me, kind of what he does maybe now to a degree, but it's definitely evolved into something larger. I don't recall back to 2007 exactly what he did." *Id.* at 14:1–12.

The Court considers that the evidence presented by Defendants regarding the employment agreement between RedMed (and later AOS) and Santos is inconsistent and self-conflicting. It is not clear from the evidence when Santos's employment began with RedMed, when and if a written employment agreement between Santos and RedMed ever went into effect, or the particular terms of that agreement. Accordingly, the Court considers that Defendants have not provided evidence that this factor weighs in favor of finding that Santos was a bona fide employee of RedMed.

#### v. Hiring and firing ability

The RedMed Defendants further argue that Santos did not have the authority to hire anyone to assist him in the performance of his work, which supports a finding of employee status. (Dkt. No. 173–2, ¶¶11–12); *see Absolute Roofing & Const., Inc. v. Sec'y of Labor*, 580 Fed.Appx. 357, 363 (6th Cir. 2014); *cf. Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 753, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). They also provide an e-mail from Hannes to Santos dated July 14, 2014, in which Hannes states, "[i]f I need to look into hiring additional help to support you having more personal time with your family ... we can discuss as well these options." (Dkt. No. 173–4, p. 22). Relators do not provide any evidence contradicting that which was provided by Defendants on this point, and the Court considers that this factor might ordinarily weigh in favor of finding that Santos was a bona fide employee of RedMed. However, that Santos had no authority to hire or fire employees of RedMed is equally consistent with Relators' theory that Santos was the employee of Fulp and merely being paid for by RedMed as a kickback to Fulp to ensure Fulp and Santos utilized RedMed products in all of their surgeries. In fact, that Santos had no authority over other RedMed employees equally supports the inference that Santos was actually the employee of Fulp and others. Accordingly, the Court places little weight on this factor.

#### vi. Fringe benefits

The RedMed Defendants assert that Santos was entitled to fringe benefits from RedMed, including health insurance, which supports a finding of an employment relationship. *See Salameh v. Provident Life & Acc. Ins. Co.*, 23 F.Supp.2d 704, 713 (S.D. Tex. 1998); *cf. Cmty. for Creative Non–Violence*, 490 U.S. at 753, 109 S.Ct. 2166. Hannes's affidavit states that, while RedMed and AOS offered these benefits, "Santos opted not to receive the health insurance because he had insurance through

another job." (Dkt. No. 173–2, ¶ 7). In addition, for a period of time, Santos was provided a company car to use in the performance of his duties as a trauma coordinator. *Id.*; (Dkt. Nos. 173–10, 246:6–25; 173–11, 257:20–24). They also provide testimonial evidence from Santos that RedMed reimbursed him for gas and other business expenses. (Dkt. No. 173–10, 248:2–4, 253:3–14). None of this evidence proffered by RedMed reflects that Santos received any fringe benefits. To the contrary, the evidence reflects that Santos was not provided fringe benefits. Reimbursement to Santos for out of pocket expenses that Santos personally incurred on behalf of RedMed is not a benefit to Santos. It is being made whole. Being provided a vehicle by RedMed to be used for delivering RedMed's products or other business purposes of RedMed is also not a benefit to Santos. Defendants offer no explanation as to how RedMed's providing tools of the trade (a vehicle to deliver product and provide transportation to meetings) is a fringe benefit. Since Santos did not participate in the health insurance program offered by RedMed, this was of no benefit to Santos as well. RedMed has failed to set forth any benefits given to Santos in addition to his remuneration. Accordingly, this factor weighs against finding Santos to be a bone fide employee.

### vii. Tax treatment

Finally, the RedMed Defendants argue that their tax treatment of Santos should not be determinative of his status as an employee. Tax documents provided by the RedMed Defendants demonstrate that, in 2011, Santos was paid by RedMed as a W–2 employee. (Dkt. No. 173–6). In 2012, he was paid first by RedMed and then by AOS as an independent contractor and treated that way in IRS Form 1099. (Dkt. Nos. 173–7, 173–8). In 2013, 2014, and 2015, he was paid by AOS and treated as a W–2 employee for tax purposes. (Dkt. No. 173–9). The RedMed Defendants argue

that, because his duties and RedMed's and AOS's ability to control the manner and means of his work did not change, the fact that Santos was paid as an independent contractor for one year should not alter the balance of factors against his being found to be an employee and not an independent contractor.

Relators argue that, contrary to the RedMed Defendants' assertion that the change in Santos's tax treatment is a detail to be overlooked, it is actually evidence that Hannes intentionally misled his competitor Stryker about Santos's roll after Stryker complained that Santos was working as a RedMed employee and a scrub technician simultaneously. In an affidavit attached to his Original Motion for Summary Judgment filed before this Court, Hannes provided a sworn statement that Santos's treatment by RedMed as a 1099 independent contractor for the 2012 tax year "was a result of a clerical error by RedMed's payroll services company, Dial-a-Check." (Dkt. No. 56–1, ¶¶ 29–30). This statement under oath to the Court is belied by an April 2, 2012 e-mail Hannes sent to two Stryker employees in which he stated, "I have moved Santos from a W2 employee to a 1099 independent contractor (2011–2012)." (Dkt. No. 182–65). In another e-mail, dated December 6, 2011, Hannes stated in response to inquiries from Stryker that Santos "does cover some call for me and other Central Sterile services RedMed provides but not at the hospital where he is employed. ... Furthermore, as of January 2012 Alex Santos will NOT be working for RedMed Inc. [sic]." (Dkt. No. 182–66). Finally, Relators point to testimony later made by Hannes in which he reasserts that the W–2 to 1099 transition was a payroll error. (Dkt. No. 182–26, 137:19–23). Later in the deposition, however, Hannes states that people at Stryker "had such a problem with Alex," and that, despite his previous sworn statement, he

intentionally changed Santos's tax status from a W–2 employee to a 1099 independent contractor. *Id.*, at 183:5–184:22.

The Court considers that Relators have raised a genuine fact issue as to whether Hannes intentionally changed Santos's tax treatment so as to avoid problems with Stryker, which had raised concerns about Santos's dual role as a RedMed employee and scrub technician. The evidence presented tends to support their assertion that Hannes used the tax treatment to disguise an improper relationship with Santos, and, further, that he swore under oath that this treatment was a mistake when it was not. What is clear to the Court is that Relators have produced some competent evidence that, for at least for some portion of his relationship with the Red-Med Defendants, Santos was treated as an independent contractor and paid accordingly. This fact weighs against RedMed's argument that he should fall under the bona fide employee exemption.

### viii. Commission payments

Another point of contention between the Parties is the relevance of whether Santos received commission for product sales as part of his employment with RedMed and AOS. As explained above, the evidence is clear that, during some if not all of his employment with RedMed and AOS, Santos received a commission based on the amount of trauma products sold by the respective company's sales representatives.

The RedMed Defendants correctly assert that the bona fide employee safe harbor provision does not exclude hired persons who were paid commissions. In support, they cite guidance published by the Office of the Inspector General (OIG) regarding the provision from the year 1991, when the safe harbor provision was proposed. The OIG guidance provides that the exception, as proposed, "permitted an employer to pay an employee in whatever manner he or she chose for having that employee assist in the solicitation of program business." Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 FR 35952–01. In response to an inquiry as to whether a part-time employee "paid on a commission-only basis" would fall within the exception, the OIG responded that, "[a]s long as a bona fide employer-employee relationship exists between the part-time employee and the employer, such a relationship falls within the scope of this provision." *Id.*[22] However, Relators point out that elsewhere in the guidance, the OIG states that it rejected commenters' requests to "extend [the bona fide employee] exception to apply to independent contractors paid on a commission basis" because of "widespread abusive practices by salespersons who are

---

**22.** The RedMed Defendants also cite a 2009 OIG Advisory Opinion regarding compensation to a mental health professional based on revenues received for services delivered by the professional in addition to compensation based on the total revenues of the clinic, in which the OIG concluded that "the wages paid to the Practitioner by the Requestor do not constitute prohibited remuneration under the anti-kickback statute." (Dkt. No. 173, p. 13) (citing OIG Advisory Opinion No. 09–02). However, the Court does not find the Advisory Opinion to be persuasive for determining whether the payment of sales commissions to Santos excludes him from being a bona fide employee under the exemption. The OIG Opinion explicitly states that "for the purposes of rendering this advisory opinion, we rely upon the certification of the Requestor that the Practitioner was a bona fide employee of the Requestor," and that "[i]f the Practitioner was not a bona fide employee under the IRS definition, this opinion is without force and effect." OIG Advisory Opinion No. 09–02. Because it begs the question of whether a person in Santos's position is a bona fide employee, it is not helpful for the Court's determination on that point.

independent contractors and, therefore, who are not under appropriate supervision and control." *Id.* Accordingly, the Court considers that, under the OIG guidance cited by the RedMed Defendants, whether Santos was paid exclusively or in part by commission is not *per se* determinative of whether he falls under the bona fide employee exception. However, courts have typically viewed payments strictly upon a commission basis to be strong evidence that the person is not a bona fide employee. *See, e.g. Rumpke v. Rumpke Container Serv., Inc.,* 240 F.Supp.2d 768, 774 (S.D. Ohio 2002) (citing Rev. Rul. 87–41, 1987–1 C.B. 296; *Short v. Central States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 574 (8th Cir. 1984)).

The RedMed Defendants also argue that, although Santos was paid on commission, it was not to sell products to doctors, but because he was responsible for training and educating sales representatives in order to increase *their* sales to doctors. (Dkt. No. 173, pp. 13–14). They do not explain, however, the significance of this difference, which is lost on the Court. The AKS is aimed at prohibiting payments to individuals intended to increase referrals to certain healthcare products and services; if the commission payments to Santos amount to prohibited payments under the Act, it is because they were aimed at increasing the amount of products Fulp purchased from RedMed and AOS. Whether the commission payments were calculated based on the amount of sales Santos himself made, or sales which he helped other RedMed or AOS representatives to make is not relevant for the purposes of the kickback prohibition. Furthermore, as explained above, the Court considers that Relators have provided evidence that Santos, Hannes, and the device manufacturers supplying them all understood Santos's roll to be aimed at increasing referrals to specific manufacturers, and even that Santos

himself helped Fulp decide which products to use. *See, e.g.,* (Dkt. Nos. 182–62, 182–63). Accordingly, the Court considers that the commission payments weigh against finding that Santos was a bona fide employee of RedMed.

After considering the evidence provided by the Parties as to the various common law factors, the Court finds that Defendants have not demonstrated that they are entitled to summary judgment that Santos was a bona fide employee of RedMed or AOS. Much of the facts presented as bearing on certain factors in favor of finding an employment relationship—such as RedMed's ability to assign additional projects to Santos and Santos's discretion over when and how long to work, and for how long and under what type of term Santos was hired—are disputed, making summary judgment inappropriate. *Trahan,* 2013 WL 2617894, at *4. While one factor undeniably weighs in Defendants' favor (*e.g.,* the source of the instrumentalities and tools of the work), Relators have produced some legally sufficient evidence that the most relevant factors weigh against finding that Santos is a bona fide employee. Santos was paid at least part of the time as an independent contractor, and Relators present evidence that RedMed changed Santos's treatment back and forth in a deliberate attempt to hide his employments status; Santos is a highly trained worker and very few, if any, of his required skills were acquired on the job; Santos received no fringe benefits; and RedMed paid him on a commission basis. Considering that many of the underlying facts are disputed, and Relators provided some evidence that the most persuasive factors weigh against Defendants, the Court considers that Defendants are not entitled to summary judgment that Santos was a bona fide employee of RedMed or AOS and entitled to the safe harbor provisions of the AKS.

### 4. MMC Defendants' Knowledge of Stark Law and AKS Violations

■ The MMC Defendants argue that Relators have not provided any evidence that would make them liable under the FCA for the alleged Stark Law and AKS violations.[23] They argue that Relators must provide evidence "showing that Hospital Defendants were aware not just of a financial relationship between Santos and RedMed, but that they were aware it was a *wrongful* financial relationship." (Dkt. No. 172, p. 34). Specifically, they argue that the MMC Defendants could not have possibly known of any AKS violation because they believed that Santos was a bona fide employee and therefore fell under the AKS safe harbor provision. *Id.*

Indeed, the FCA creates liability only for a person who "knowingly" presents a false claim. 31 U.S.C. § 3729(a)(1). Nonetheless, specific intent to defraud the government is not required. *Id.* at § 3729(b)(1)(B). The statute defines "knowingly," to mean that a person, with respect to information, has actual knowledge of the information or acts in deliberate ignorance or in reckless disregard of the truth or falsity of it. *Id.* at § 3729(b)(1). The statute excludes liability for innocent mistakes or negligence. *U.S. v. Southland Mgm't Corp.*, 326 F.3d 669, 681 (5th Cir. 2003) (J. Jones, concurring). There is also strong support for the proposition that the FCA does not reach claims based on reasonable but erroneous interpretations of a defendant's legal obligations. *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015); *see also U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190–91 (8th Cir. 2010).

The MMC Defendants argue that, to prove that they knowingly submitted false claims, Relators must provide evidence that it was unreasonable, at the time the claims were submitted, for them to believe that Santos was a bona fide employee of RedMed. The Court considers this to be an incorrect interpretation of the law. While it is true that FCA liability does not attach to reasonable but erroneous interpretations of the law—in this case, an incorrect but nonetheless reasonable conclusion that, based on the multifactor common law control test, Santos was a bona fide employee of RedMed—the statute requires a defendant to actually come to that reasonable but incorrect conclusion. Indeed, in every case cited by Defendants or reviewed by the Court in which a defendant was found to have relied upon a reasonable but incorrect interpretation of their legal obligations under the FCA, the defendant actually came to a conclusion about those obligations. *See, e.g., Purcell*, 807 F.3d at 284–85; *Hixson*, 613 F.3d at 1189. There is no support for the proposition that a defendant may disregard its obligations under the FCA and then argue *ex post facto* that a reasonable interpretation of applicable law supports its prior position.

Here, The MMC Defendants do not argue that they undertook any effort to determine whether Santos was a bona fide employee of RedMed. The only evidence they cite for the proposition that they believed Santos to be a RedMed employee is an e-mail form Patricia McClelland, Compliance Officer at South Texas Health Systems, to other MMC Defendant employees stating that Santos "is also an employee of RedMed." (Dkt. No. 172–1, p. 63). However, this e-mail belies the MMC Defendants' position as much as it supports it. The

---

**23.** While the MMC Defendants allege that they did not act with the requisite scienter for FCA liability for the Device Scheme, Defendants present no other argument that Rela-

tors' have failed to show FCA liability as to each of them for the underlying AKS and Stark Law violations.

email supports a finding that the MMC Defendants knew that Santos's relationship with RedMed may violate the AKS; the e-mail's subject line is "Update on Alex Santos Compliance Issue," and in it Ms. McClelland references "the issues in the compliance line call" regarding Santos, specifically referencing a need for information about cases "[Santos] was involved with both as an employee and as a rep." (Dkt. No. 172–1, p. 63). These statements, if anything, support a proposition that MMC knew—or at last suspected—that Santos's relationship with RedMed was problematic under the FCA. The mere reference of the word "employee" does not support the MMC Defendants' position that they determined, based on a reasonable interpretation of the bona fide employee exception, that Santos's dual role did not violate the AKS.

Meanwhile, Relators provide evidence that MMC acted with at least reckless disregard to whether the Device Scheme violated the Stark Law and AKS. They provide internal MMC documents showing that MMC was aware of several complaints about Santos and conducted an internal investigation regarding whether Santos was violating MMC policy. (Dkt. Nos. 182–8–182–13; 182–43; 182–58). While a December 23, 2011 letter from Mario Garza indicates that the MMC Corporate Compliance Committee had "reviewed Mr. Santos' employment status at McAllen Medical Center/ South Texas Health System and his relationship with RedMed, Inc. and has found no conflict," nothing in the letter demonstrates that MMC's opinion was based on their interpretation that Santos was a bona fide employee under the AKS safe harbor provision. (Dkt. No. 182–16). Indeed, despite their assertion that they believed Santos to be a bona fide RedMed employee, MMC's corporate representative and Compliance Officer Patricia McClelland testified that she did not know how Santos was compensated by RedMed, a fact which suggests that MMC did not conduct any review of whether Santos was a bona fide employee of RedMed at all. (Dkt. No. 182–31, 118:9–23). Furthermore, after complaints were made that Santos worked as a sales representative and a scrub tech, and MMC employees suggested that Santos had to make a choice between employers so as to avoid a conflict of interest, MMC CEO Joe Riley wrote that "[Santos] is an excellent employee, a key player in our ortho business and to date I have not been given any info on inappropriate action on his part." (Dkt. No. 182–14, p. 2).

All of this evidence, when viewed in the light most favorable to the Relators, supports a reasonable inference that the MMC Defendants did not make a good-faith determination, pursuant to a reasonable interpretation of the AKS, that Santos was a bona fide employee under the safe harbor provision. Indeed, in the Court's view, the Relators have presented legally sufficient evidence that supports their contention that the MMC Defendants intentionally disregarded every indication—from Stryker, from their compliance officers, and from their own employees—that Santos's relationship with RedMed was improper, and that they did so because Santos was considered a "key player" in their business.

Because the Court finds that Relators have presented sufficient evidence to allow a reasonable jury to conclude that the Device Scheme violated both the AKS and Stark Law, and that MMC had the requisite knowledge to create the FCA liability, it moves on to examine Defendants' arguments that they are entitled to summary judgment on Relators' FCA conspiracy claims.

## D. FCA Conspiracy

Relators also bring claims against all Defendants for FCA conspiracy

under 31 U.S.C. § 3729(1)(1)(C). To demonstrate an FCA conspiracy between the Defendants, Relators must be able to show (1) the existence of an unlawful agreement between Defendants to get a false or fraudulent claim allowed or paid by a government payor and (2) at least one act performed in furtherance of that agreement. *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). As to the first requirement, Relators are not required to demonstrate the manner in which the agreement came into being, only that an agreement did, in fact, exist. *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *26 (S.D. Tex. June 12, 2014), on reconsideration in part sub nom. *Ruscher v. Omnicare Inc.*, No. 4:08-CV-3396, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014). Defendants Fulp and Santos both assert that Relators have presented no evidence of any unlawful agreement to submit false claims involving Dr. Fulp, "let alone evidence of an act in furtherance of such an agreement." (Dkt. Nos. 175, p. 21; 176, ¶ 26).[24] The Court concludes the Relators have presented some legally sufficient evidence of this claim.

■ With respect to the Surgery Delegation Scheme, Relators have demonstrated sufficient evidence to allow a reasonable inference that Fulp, Santos, and MMC implicitly agreed to submit false claims to the government. As discussed above, MMC and Fulp received multiple complaints from MMC staff about Santos performing critical aspects of Fulp's surgeries without appropriate supervision. Relators provide evidence that a dozen nurses signed a letter in 2010 addressed to MMC hospital administration requesting that MMC put a stop to what they saw was improper delegation, but MMC took no action in response, while Fulp and Santos maintained the delegation scheme for years. Relators provide evidence that the scheme was so well known at MMC that MMC employees and sales reps referred to Santos as "Dr. Santos"; Fulp himself referred to Santos as "doctor" during his deposition. (Dkt. Nos. 182-53, 65:6-17; 182-54, 25:2-10). Further evidence suggests that the MMC Defendants, Fulp, and Santos recognized each other's role in the scheme. Relator Adan Ponce provides a sworn statement that Santos "bragged to [Ponce] in 2008 that he was better than most doctors at doing orthopedic surgical procedures," including "drilling screws into patients' vertebrae," and that he was not worried about getting in trouble because "Dr. Fulp had everything taken care of with the hospital." (Dkt. No. 182-77, ¶¶ 7, 8). Viewing all of this evidence in the light most favorable to Relators, the Court considers that a reasonable fact-finder could conclude that MMC, Fulp, and Santos all agreed to continue improper delegations of surgical duties to Fulp, and that they did so because it was financially rewarding to each of them.

Furthermore, as to the Device Scheme, Relators provide similar evidence allowing a reasonable fact-finder to conclude that the RedMed Defendants, Santos, Fulp and MMC implicitly agreed to maintain a scheme that led to false claims being made to the government. Relator Adan Ponce provided a sworn statement that Fulp told Ponce that Ponce was forcing him to use RedMed's inferior products because RedMed, not Smith & Nephew, had hired Santos. (Dkt. No. 182-77, ¶ 20). Internal MMC

24. The Court notes that, while both Fulp and Santos bring motions for summary judgment as to *Fulp's* FCA conspiracy liability, no party brings motions for summary judgment based on Santos's FCA conspiracy liability. The MMC Defendants and the RedMed Defendants only bring summary judgment claims as to their FCA conspiracy liability on the basis that Relators have not established a viable FCA claim against them.

documents show that someone complained that Santos was "offer[ed] his first assistant skills in exchange for doctors using the product he sells." (Dkt. No. 182–58, p. 2). Further evidence shows that a nurse complained to MMC risk management staff about Santos being a surgical assistant and device representative who "uses [his] own products" in surgeries. (Dkt. No. 182–8, p. 4). Despite this evidence, MMC never took any action to stop the Device Scheme, instead ceasing their investigations upon a conclusion that, in all surgeries in which Mr. Santos served as a scrub technician and a RedMed device was used, there was another RedMed representative present. (Dkt. No. 182–16). Relators also provide MMC e-mails suggesting the MMC CEO Joe Riley intentionally blocked further investigation into the issue because it made MMC money, calling Santos a "key player" in the hospital's business. (Dkt. No. 182–14, p. 2). As with the Surgery Delegation Scheme, the Court considers that Relators have provided sufficient evidence for a reasonable jury to conclude that the RedMed Defendants, the MMC Defendants, Santos, and Fulp agreed to continue the Device Scheme.

As to Fulp's and Santos's argument that Dr. Fulp did not take any action in furtherance of the alleged conspiracy, the Court considers the evidence provided that Dr. Fulp delegated critical portions of his surgeries to Santos, allowed Santos to perform some parts of surgeries without direct supervision, utilized Santos as his scrub technician while Santos also served as a sales representative for RedMed, and actually submitted claims to government payors arising out of these surgeries. All of this is evidence that supports a finding that Fulp not only took an action in furtherance of the Surgery Delegation Scheme and the Device Scheme conspiracies, but that he was central to them.

Finally, all Defendants argue that, because they assert that Relators have failed to establish any underlying FCA violation by any of them, their conspiracy claims necessarily fail as well. Because the Court has found that Relators have provided sufficient evidence to establish an FCA liability for the MMC Defendants, Hannes, and Fulp as to the Surgery Delegation Scheme and MMC Defendants, the RedMed Defendants, Hannes, and Fulp as to the Device Scheme, it rejects this argument.

Because the Court finds that Relators have provided sufficient evidence to allow a reasonable trier of fact to conclude that all of the Defendants engaged in an FCA conspiracy, it moves on to address Defendants' argument that they are not liable under the TMFPA.

## E. TMFPA Liability

■ Relators also bring claims against all Defendants under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code § 36.002 *et seq.* In particular, Relators invoke two particular unlawful acts under the TMFPA in their Second Amended Complaint. They allege that Defendants violated the provisions stating that "[a] person commits an unlawful act if the person:

knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; [or]

knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning ... information required to be provided by a federal or state law, rule, regulation, or

provider agreement pertaining to the Medicaid program

Tex. Hum. Res. Code §§ 36.002(1), (4)(B).

Like the FCA, the TMFPA is aimed at fraudulent statements made in connection with claims made to government payors. All of the Defendants, in their respective Motions for Summary Judgment, present an argument that Relators' claims under the TMFPA should fail for the same reason that their FCA claims fail. As the Court has explained above, Relators have provided evidence that would allow a reasonable trier of fact to find FCA liability against all Defendants. Accordingly, Defendants' sole argument on this point is not persuasive.

The Court finds that Relators have presented sufficient evidence to allow a reasonable jury to find the Defendants liable on all counts. Lastly, it addresses certain evidentiary objections made by Fulp in his Reply to Relators' Omnibus Response.

## VI. Dr. Fulp's Motion to Strike

In his Reply to Relators' Omnibus Response, Fulp moves to strike, in whole or in part, numerous affidavits and documents submitted by Relators. In particular, Fulp brings objections to affidavits and documents submitted by Relators on the grounds that they contain hearsay. Fulp also brings objections to Relators' and Elizabeth Meza's affidavits on the basis that they are incompetent to testify as to whether Santos exceeded his permissible scope of practice. Finally, Dr. Fulp moves to strike the affidavits of Relators' experts Dr. Brian D. Piper, PhD; Dr. James E. Alexander, Jr.; Dr. Amanda Marshall-Rodriguez, MD; Dennis Stover; and Donald R. Deere, PhD on the basis that the expert witnesses are unqualified and that the content of their affidavits is unsupported and speculative. The Court addresses each type of objection in turn.

## A. Hearsay objections

■ Fulp presents numerous objections to various parts of the declarations provided by Relators Adan Ponce and Keith Waldmann and by nurse Elizabeth Meza, as well as to documents submitted by Relators, all on the basis that they contain hearsay. However, Fulp does not argue that the content of Relators' testimony cannot be offered into evidence in some admissible form.

The Court notes that many of the statements objected to by Fulp contain hearsay in the form of statements either made by Santos or Fulp himself that qualify as statements against interest. For example, Dr. Fulp objects to Relator Ponce's statement that Santos "bragged to [Ponce] in 2008 that he was better than most doctors at doing orthopedic surgical procedures," including "drilling screws into patients' vertebrae," and that he was not worried about getting in trouble because "Dr. Fulp had everything taken care of with the hospital." (Dkt. No. 182–77, ¶¶ 7, 8). Dr. Fulp also objects to Ponce's statement that Santos approached him about increasing Smith & Nephew's business through a deal in which Santos would get hired by Smith and Nephew, and that later Dr. Fulp called him a "dumb ass" for not taking that deal, and that Fulp was forced to use RedMed's inferior products since RedMed hired Santos. *Id.*, at ¶¶ 19–20; *see also* (Dkt. No. 182–79, ¶ 4). These statements, and others like it to which Dr. Fulp objects are clearly admissible hearsay as statements against interest. *See* Fed. R. Evid. 804(3).

Other statements objected to by Dr. Fulp, while hearsay, may be presented in admissible form at trial, and Dr. Fulp does not present an argument otherwise. These statements are made by known co-workers of the witnesses who can make themselves available at trial, or documents or other

**634**

physical evidence that could be presented at trial. *See, e.g., id.* at ¶ 143; (Dkt. Nos. 182–72, ¶¶ 13–14; 182–79, ¶¶ 3, 5; 182–78, ¶ 5); *State Farm Lloyds v. Jones*, No. 4:05-CV-389, 2006 WL 2589059, at *2 (E.D. Tex. Sept. 6, 2006) ("Proffered evidence in a summary judgment motion need not be in admissible form, but its content must be admissible."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, none of these statements were relied on by the Court in finding that Relators' had provided sufficient evidence to survive summary judgment.

Dr. Fulp also objects to numerous documents presented by Relators on the basis that they contain hearsay. Although he admits that "a number of documents are likely subject to the business-records hearsay exception," he argues that most of them are nevertheless inadmissible because they contain internal layers of hearsay. (Dkt. No. 190, p. 25). Without going into the details of each of these documents, the Court considers that most, if not all of them are indeed admissible under the business records exemption. To the extent they contain internal hearsay, they are statements made by known MMC employees that could make themselves available at trial, and Dr. Fulp presents no argument as to why this evidence could not be presented in an admissible form at trial. Nonetheless, the Court considers that, even in the case of MMC records containing internal hearsay comes from an anonymous caller, these statements are admissible to support the proposition that MMC knew of the content of the caller's complaint, not for the truth of the matter asserted by the anonymous caller. *See* (Dkt. No. 182–58). In making its findings on the summary judgment orders, the

Court did not consider any hearsay statements for the truth of the matter asserted.[25]

## B. Objections as to the Competency of Non–Expert Witnesses to Testify to the Permissible Scope of Santos's Practice

Dr. Fulp also objects to Relators' and Ms. Meza's statements regarding how often they saw Santos perform functions outside the permissible scope of his practice on the basis that they are not qualified or competent to testify as to the permissible scope of Santos's practice. *See,* (Dkt. Nos. 182–77, ¶¶ 5, 22; 182–78, ¶ 12; 182–79; ¶ 5). However, as to each of these statements, the witness explains *why* they believe Santos was operating outside the scope of his practice. *See, e.g.* (Dkt. No. 182–77, ¶ 5) ("To the extent to which Santos conducted critical parts of surgeries, often without any supervision at all, was without parallel in the thousands of surgeries that I have attended and observed in my career."); (Dkt. No. 182–78, ¶ 12) ("Many of the times, Dr. Fulp would not scrub in for the entirety of the surgery. He would dictate the operative notes while Santos performed the surgery. Dr. Fulp often would not be present while Santos was sawing on the patient."); (Dkt. No. 182–79, ¶ 5) ("Based on my training and experience as a nurse and a surgical tech, I knew that Santos was performing well beyond the scope of his job. For example, Santos would saw bone, place implants, drill screws and nails, and insert rods into patients."). The Court does not consider that, in any of these statements, the witnesses commented on anything other than facts within their personal knowledge or that they personally observed.

25. Dr. Fulp also objects to numerous documents that he argues are inadmissible because they are irrelevant to him. The Court clarifies that it considered the evidence presented by Relators only to support the propositions to which that evidence is relevant.

## C. Objections to Expert Witness Affidavits

██ Fulp also brings numerous objections to Relators' expert witness affidavits. The majority of Fulp's objections to this evidence follow the same form; they challenge the expert witnesses as unqualified, and that the conclusions they draw are therefore unreliable. The Court rejects this argument as to all expert witnesses outright. The Court concludes on the present record before it that Fulp's objections regarding the qualification of an expert witness primarily go to the weight attached by the factfinder to the witness's testimony, not to the testimony's admissibility. *See, e.g. Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). While a court must exclude an expert witness if it finds that the witness is not qualified to testify in a particular field on a given subject under Rule 702 of the Federal Rules of Evidence, Rule 702 "does not mandate that an expert be highly qualified in order to testify about a given issue," and "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786). After reviewing the qualifications of each of Relators' expert witnesses, the Court considers that they have made at least the minimum showing of their qualifications to testify on the various issues contained in their affidavit,[26] and that Fulp's arguments that the experts may be "relatively inexperienced" are not grounds for striking their affidavits from the summary judgment record. (Dkt. No. 190, p. 21).

Similarly, Fulp's other arguments as to the "admissibility" of the expert testimony are better characterized as addressing the weight of their opinions. For example, Fulp claims that Dr. Piper's testimony regarding the likelihood that procedures in which OR records show Fulp to be in more than one operating room at once indicate that he allowed Santos to carry out surgical functions without proper supervision is "fatally flawed because it does not exclude various other equally possible explanations for the overlapping entry/exit times in the OR logs," and because "there is no evidence cited in Dr. Piper's analysis that anything improper occurred during the periods of overlap." *Id.* at pp. 16–17. Fulp also contends that Dr. Piper's testimony is inadmissible because it relies on the Marshall–Rodriguez and Stover opinions to conclude that Fulp's claims for total knee replacements were false, on the basis that cuts allegedly performed by Santos during knee replacements are neither categorically prohibited under Texas law nor violative of any condition of Medicare payment. As the Court has explained above, it considers that—independent of the experts' testimony and given the other evidence presented

---

26. The Court notes that, as pointed out by Dr. Fulp, the statement of Dr. Marshall–Rodriguez does not appear to be accompanied with her *curriculum vitae*. (Dkt. No. 182–73). However, this appears to be an oversight by Relators, as Dr. Marshall–Rodriguez states that her *curriculum vitae* is attached as an exhibit to her statement. *Id.* at ¶ 2. Nonetheless, Dr. Marshall–Rodriguez states that she is a medical doctor, licensed to practice in the State of Texas since 2006, and establishes the very minimum qualifications necessary to opine on the medical decisions at issue. *See id.* The Court considers that any further scrutiny of Dr. Marshall–Rodriguez's qualifications is best done through cross-examination at trial or pre-trial motions. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

by Relators—the instances in which Fulp is shown as being in more than one operating room at a time is some evidence that, during those surgeries, he allowed Santos to conduct surgical tasks without proper supervision. Similarly, the Court does not rely on the experts' opinions alone in concluding that Relators have provided some legally sufficient evidence from which a reasonable trier of fact could find that Santos regularly performed critical portions of knee replacements in violation of Texas law and Medicare conditions of payment. Nonetheless, the Court considers that Fulp's argument with respect to the experts' testimony is merely a reiteration of his substantive legal argument couched in terms of an evidentiary objection, and does not give rise to grounds for striking any of Relators' expert affidavits.

Fulp's objection that Dr. Marshall–Rodriguez's opinions are unreliable is unpersuasive. Dr. Fulp's only justification for this assertion is that Dr. Marshall–Rodriguez's opinion that a physician may never delegate the cutting of a bone to a surgical assistant, regardless of whether the assistant is acting under the direct supervision of a physician, is inconsistent with the Texas Occupations Code's explicit disfavoring of global prohibitions or restrictions on the delegation of medical acts. *Id.*, p. 21. This argument amounts to an assertion that Dr. Marshall–Rodriguez's testimony is inadmissible because it is at odds with Dr. Fulp's own view of the law; as the Court has made clear, her opinion is consistent with the Court's own interpretation of Texas's prohibition on surgical assistants: their duties are limited to "providing aid under direct supervision in exposure, hemostasis, and other intraoperative technical functions that assist a physician in performing a safe operation with optimal results for the patient, including the delegated authority to provide local infiltration or the topical application of a local anesthetic at the operation site." Tex. Occ.

Code § 206.001(6). In light of this restrictive language—which Dr. Fulp's comprehensive brief does not address—Dr. Marshall–Rodriguez's conclusion appears to be consistent with the Texas Occupation Code.

 Finally, Dr. Fulp brings objections to the declaration of Donald R. Deere, PhD, on the basis that it is based on flawed assumptions. Based on Relator Ponce's statement that of the surgeries in which he, Fulp, and Santos were present, Ponce estimates that approximately 80% of the time Santos performed significant portions of the surgery, Dr. Deere calculates how many of the claims for surgeries during that period were for procedures in which Santos performed significant parts of the surgery. *See generally* (Dkt. No. 182–80). First, Fulp objects to Dr. Deere's finding because it is based on Relator Ponce's statement, which Fulp argues is "speculation, has no factual or logical basis, and is completely arbitrary." (Dkt. No. 190, p. 22). To the contrary, the Court considers Ponce's statement to be some legally sufficient evidence based on his own personal knowledge and experience. *See* FED R. CIV. P. 56(c)(4). Second, Dr. Fulp argues that the alleged cases in which Ponce testified that he witnessed Santos performing significant portions of procedures are "not a valid statistical sample," but he offers no explanation for that assertion, citing only a case that the Court finds distinguishable. (Dkt. No. 190, p. 24) (citing *United States v. Rockwell Space Operations Co.*, No. CIV.A.H-96-3626, 2002 WL 864246, at *9 (S.D. Tex. Apr. 3, 2002) (finding that Relator's estimate of how many fraudulent practices results in overcharges to the government were unsupported because "Relator offered no verifiable evidence, objective data, or statistical sampling to support his estimates," and "it is undisputed that Relator is not an

expert and is not qualified to conduct statistical sampling or to offer a scientific basis for his estimates."). As explained above, the Court considers Dr. Deere to have established his status as an expert in statistics. Furthermore, he has explained his methodology and relied on verifiable evidence and statistical sampling to support his data. Accordingly, the Court at this stage of the proceedings finds no reason why his testimony should be excluded from the summary judgment record.

In sum, the Court denies Fulp's Motions to Strike. Any evidence provided by Relators which was not likely to be admissible or was irrelevant was not considered by the Court.

## VII. Conclusion

As explained above, the Court finds that Relators have provided some legally sufficient evidence to illustrate a genuine dispute of material fact for each element of FCA liability.

With respect to the Surgery Delegation Scheme, the Court finds that Relators have presented some legally sufficient evidence that, if proven, shows that the scheme violated Texas laws and Medicare regulations. The Court further finds that the Relators have presented some legally sufficient evidence demonstrating a genuine dispute as to whether the MMC Defendants and Fulp submitted claims that were both factually and legally false or fraudulent, and that they were false or fraudulent in a manner that was material to the government's decision to pay those claims. The Court also finds that Relators have provided some legally sufficient evidence that such claims were caused to be made by the actions taken by the MMC Defendants, Santos, and Fulp, and that the MMC Defendants, Santos and Fulp acted at least with reckless disregard to the claims' material falsity. Finally, the Court finds that Relators have provide some le-

gally sufficient evidence from which the trier of fact could determine by a preponderance of the evidence the number and amount of claims MMC and Fulp respectively submitted that were rendered false by the Surgery Delegation Scheme.

With respect to the Device Scheme, the Court finds that Relators have presented some legally sufficient evidence to allow a reasonable trier of fact to find that the RedMed Defendants, Fulp, and Santos violated the Stark law and the AKS. The Court finds that Relators have submitted some legally sufficient evidence demonstrating a genuine dispute of material fact as to whether Santos was a bone fide employee of RedMed and AOS so as to fall under the safe harbor provision of the AKS. The Court finds that Relators have provided some legally sufficient evidence suggesting that MMC acted with at least reckless disregard to the alleged AKS and Stark Law violations in making claims to government health care payors.

Furthermore, the Court finds that Relators have provided some legally sufficient evidence from which the trier of fact could conclude that all of the Defendants engaged in a conspiracy to violate the FCA, whether under the Surgery Delegation Scheme and/or the Device Scheme. Because the Court finds that Relators have provided some legally sufficient evidence to establish each element of their FCA and FCA conspiracy claims, and Defendants' only argument for summary judgment on the TMFPA claim is that Relators' FCA claims must fail, it does not consider summary judgment to be proper on Relators' TMFPA claims.

Finally, the Court considers that Fulp's evidentiary objections are without merit.

Accordingly, the Court hereby **ORDERS** that:

Defendants McAllen Medical Center, South Texas Health System, and McAllen Hospitals, L.P.'s Motion to Dismiss, or, in the Alternative, for Summary Judgment, (Dkt. No. 172), is hereby **DENIED.** Furthermore,

Defendants RedMed, Inc., Jeffrey L. Hannes, and Northern Services LLC d/b/a Advanced Orthopedic Solutions' Motion for Summary Judgment, (Dkt. No. 173), is hereby **DENIED.** Furthermore,

Defendant Dr. Ray Fulp, III's Motion for Summary Judgment, (Dkt. No. 175), is hereby **DENIED.** Furthermore,

Defendant Alex Santos's Motion for Summary Judgment, (Dkt. No. 176), is hereby **DENIED.**

SO ORDERED this 12th day of October, 2016, at McAllen, Texas.